(87 South. 375)

### JOHNSON v. CRAFT et al. (3 Div. 501.)

(Supreme Court of Alabama. Feb. 3, 1921.
Rehearing Denied Feb. 24, 1921.)

**1. Constitutional law ⚚½, New, vol. 4 Key-No. Series—Constitution is supreme law, subject only to federal Constitution.**

The state Constitution is the supreme law, subject only to the restraints resulting from the Constitution of the United States.

**2. Constitutional law ⚚5—Modes of amendment prescribed by Constitution are exclusive.**

The Constitution commits to no body, officer, or agent any authority or power whatever to change, modify, or suspend the effect or operation of its mandates or prohibitions, but in sections 284–287 prescribes the exclusive modes by which it may be altered or amended, or its effect and operation changed.

**3. Constitutional law ⚚6—Provisions respecting amendment are mandatory.**

The provisions of Const. 1901, §§ 284–287, providing for amendment, are mandatory, and not directory, and are binding on the people themselves, and' conclude every department, body, officer, and agency under the authority of the Constitution.

**4. Constitutional law ⚚7—Power of Legislature to propose amendments must be exercised in mode prescribed.**

The power of the Legislature under Const. 1901, §§ 284–287, to propose amendments, is a particular special power not possessed by the Legislature, otherwise than through grant by the instrument itself, and can only be exercised in the mode prescribed.

**5. Constitutional law ⚚7 — In proposing amendments, Legislature is not exercising law-making power.**

In proposing amendments to the Constitution under sections 284–287, the Legislature is not exercising its power to make laws.

**6. Constitutional law ⚚7—Road bond amendment held not legally adopted, because fixing of date for election left to the Governor.**

Under Const. 1901, § 284, providing that the Legislature proposing amendments shall order an election to be held at the general election next succeeding, or upon another day appointed by the Legislature, not less than three months after the final adjournment of the session, the power to appoint a date for the election cannot be delegated to the Governor, and as Acts 1919, p. 787, proposing an amendment to be known as article 20, and providing for the issuance of bonds for the construction of state highways, etc., did not fix a date for the election, but provided that the Governor should call an election after 90 days from final adjournment, the amendment was not legally adopted, and is not a part of the Constitution.

On Rehearing.

**7. Constitutional law ⚚45 — Supreme Court not authorized to condone violations of the Constitution.**

No power or authority is conferred on the Supreme Court or its judges to forgive, condone, or cure violations of the plain, unambigu-ous mandates, prohibitions, or limitations of the Constitution, though the violation results in the greatest good or promotes a universal benefaction.

**8. Constitutional law ⚚16—Construction not influenced by public sentiment.**

The courts cannot permit public sentiment to influence the construction of the Constitution.

**9. Constitutional law ⚚½, New, vol. 4 Key-No. Series—Product of violation of Constitution is a nullity.**

The penalty for violation of'the Constitution is that the product of the offense is a nullity.

**10. Constitutional law ⚚7—Failure of Legislature to fix date for election on amendment not cured by favorable vote, etc.**

The failure of Acts 1919, p. 787, proposing the road bond amendment to the Constitution, to fix the date for the election on such amendment, is not cured by lapse of time, by the favorable vote of the electors participating in the election, or by any action taken under the proposed amendment.

**11. Constitutional law ⚚½, New, vol. 4 Key-No. Series—People are bound by Constitution, and can only change it in manner prescribed.**

The people themselves are bound by the Constitution, and, being so bound, are powerless, whatever their numbers, to change or thwart its mandates, except through a constitutional convention, or by amendment according to the mode therein prescribed, or through the exercise of the right of revolution.

**12. Constitutional law ⚚7—In fixing time for election, Legislature is· not exercising law-making power, within rule as to delegation of powers.**

Under Const. 1901, § 284, the appointment by the Legislature of the date for an election on a proposed amendment to the Constitution cannot be separated from the proposal of the amendment, and the power to fix such date, as the power to propose amendments, is conferred on the Legislature as an entity, and not in its law-making capacity within the rule as to the delegation of discretion in making laws, especially in view of the provision of section 287, that no act or resolution proposing amendments to the Constitution shall be submitted for the approval of the Governor.

**13. Constitutional law ⚚19—Plain and unambiguous provisions of Constitution cannot be changed by contemporaneous construction.**

Contemporaneous construction or practices illustrative of an interpretation otherwise than according to the plain and unambiguous intent of the terms employed in the Constitution cannot be consulted or heeded, to the end that its plain, unambiguous provisions may be deflected from their intended and avowed effects.

**14. Constitutional law ⚚7—Amendments may be proposed by act or resolution.**

In proposing amendments to the Constitution under sections 284–287, the Legislature may act either by act or resolution.

Somerville, Gardner, and Thomas, JJ., dissenting.

Appeal from Circuit Court, Montgomery County; Walter B. Jones, Judge.

Bill by A. M. Johnson, Jr., against John Craft and others constituting the Alabama State Highway Commission, to enjoin the issuance of the good roads bonds. From a decree overruling demurrers to the bill, complainant appeals. Reversed and remanded.

## Statement of the Case.

This bill, filed by a citizen of Montgomery county, a taxpayer and automobile owner, seeks injunctive relief to restrain the State Highway Commission and its members and agents from observing and giving effect to what is commonly called and known as the road bond amendment to the Constitution of Alabama—the act purporting to submit a proposed amendment to the Constitution of Alabama, being published in General Acts of 1919, pages 787–791, inclusive. The act, in its entirety, reads:

"An act to submit to the qualified electors of this state at a special election to be held at the call of the Governor after ninety days from the final adjournment of this Legislature for their consideration of an amendment to the Constitution for the purpose of authorizing the state to establish and maintain a state highway system of public roads and bridges, to issue interest bearing bonds therefor to authorize the levy and collection of automobile or other motor driven vehicle taxes by the state for said purposes and to provide for the establishment and maintenance of said state highway system, public roads and bridges according to such regulations as the Legislature may have prescribed or may hereafter prescribe.

"Be it enacted by the Legislature of Alabama:

"Section 1. That whereas the time has now come for the people of this state to construct and properly maintain a complete and permanent system of state highways, roads and bridges and to provide means to defray the cost of constructing and maintaining the same perpetually and in a satisfactory manner to meet the requirements of public travel and traffic, and also to secure the large but delayed appropriation for said purpose by the national government, which appropriation has been duly made by the acts of Congress of the United States for the construction of public highways, roads and bridges on condition that the state shall furnish the proper amount required of it for said purpose before the appropriation of the national government shall become available, and whereas a state highway system has been laid out in this state, connecting up all the counties together, and the same have been approved by the Legislature and the state highway department, but has not been built and maintained nor meet the demands made upon it for lack of means, and whereas the most important matter before the people and this Legislature at this time is the popular demands for a determination as to what measures shall be best taken to provide a complete, permanent and excellent system of public highways for this state, now therefore:

"Section 2. That the following amendment of the Constitution of Alabama is proposed to be submitted to the qualified electors of the state for their ratification or rejection at an election to be held and called by the Governor after ninety days from the final adjournment of this session of the Legislature of which the amendment is proposed, which amendment is as follows, to wit:

"Section 3. Article XX. Section 1—A. That for the establishment, construction and maintenance of a permanent, excellent and complete system of state highways, public roads and bridges in this state serviceable for three hundred and sixty-five days in the year, and to enable the state to secure the national appropriations for public highways there shall be issued and sold by the state of Alabama interest-bearing negotiable state bonds, not to exceed the sum of twenty-five million ($25,000,-000) dollars, that said bonds shall bear interest at the rate of not exceeding five per centum per annum, payable annually or semi-annually, shall mature serially or otherwise not less than three or more than forty years from the date of their issuance, shall be made payable out of the state road and bridge fund which fund is created for that purpose, shall be executed, sold and delivered on behalf of the state from time to time, shall be of denominations of ten dollars and up to one thousand dollars, and mature as may be determined, subject to the approval of the Governor, by the highway commission who shall also be highway bond commission acting by majority vote with all proceedings for such commission together with the approval of the Governor thereto, reduced to writing and made of record, and the record and registration of said bonds shall be duly deposited in the office of the state treasurer and kept by him; that said bonds shall be signed by the Governor, state auditor and state treasurer, and shall have the great seal of the state attached thereto, attested by the secretary of state, the coupons shall be numbered and signed by the state treasurer. Said bonds shall be exempt from state, county and municipal taxes: Provided, however, that the fac simile signatures upon the interest coupons of said bonds may be lithographed in lieu of signing; that said bonds shall be the direct obligation of the state and for the payment thereof the full faith and credit of the state is hereby irrevocably pledged that the proceeds derived from the sale of said bonds shall be deposited in the state treasury and kept in a separate fund and shall be exclusively used to defray the cost of constructing and maintaining said highways, public roads and bridges of the state. The said bonds shall be sold at not less than par. B. That for the purpose of securing the prompt payment of the principal and interest of said bonds to provide a sinking fund therefor, to place sufficient revenue in said state road and bridges fund, and to defray the cost of constructing and maintaining said state highways public roads and bridges continuously in a highly serviceable condition that a state license tax on all automobiles or motor driven vehicles is hereby authorized to be levied and collected on all such vehicle privilege license tax now levied or which may hereafter be levied by law of every kind and description shall be

exclusively used for the payment of said bonds, principal and interest, for creating a sinking fund for their maturity and the remainder for the maintenance of said public highways, roads and bridges and extension of the state highway system, that county roads and bridges may be built and maintained by the aid of the state and national government, that state roads and bridges may be built and maintained by the aid of the state and national government, that state roads and bridges may be built and maintained with the aid of the county and national government, that said state highways, roads and bridges shall be constructed and maintained by the state highway department, and all moneys derived from the sale of said bonds shall be expended as the highway department may direct subject to the approval of the Governor. C. That the state highway commission or highway department shall locate, construct and maintain, the highways or state trunk roads so as to connect each county seat with the county seats of the adjoining counties by the most direct and most feasible route by a permanent route having due regard to the public welfare and to connect the county seats of the several border counties at or near the state line with a public road in the border states: Provided that in counties divided into two judicial divisions in each of which regular terms of the circuit court are held, the places where said terms of court are held, shall be connected with each other. It shall be the duty of said state highway commission or highway department to equitably apportion among the several counties the expenditures of both money and labor and the time or times of making such investments; said roads to be constructed and maintained without expense to the several counties. G. That this amendment and the foregoing provisions thereof when ratified by the people are self-executing without the aid of further legislation, but the Legislature shall pass such laws as it may deem necessary to secure the full benefit and effect of this amendment to the Constitution. Either at this session of the Legislature or at the earliest possible time after the ratification by the people that this amendment shall become immediately in full effect, nothing in the Constitution and sections 213 and 93 thereof to the contrary notwithstanding.

"Section 4. That it shall be the duty of the Governor to fix the date of said election and to give notice by proclamation to be published in one newspaper in each county in the state at least seven successive weeks next preceding to said election of the amendment proposed by this act to be submitted to the qualified electors of the state for this ratification or rejection.

"Section 5. That at said election to be held as herein provided the qualified electors shall vote upon said amendment, and on the official ballot printed for such election there shall be printed said amendment according to the words and figures herein above set out and shown in section 3 of this act, and also thereafter words 'Yes,' 'No.' The choice of the elector shall be indicated by a cross-mark by him under his direction opposite the words expressing his desire, and before said amendment shall be printed on said ballot the following words:

'Shall the following amendment be adopted as article XX of the Constitution of Alabama.' That the officers holding said election shall be the same and shall be appointed in the same manner and by the same officials as provided by the election law of the state for the appointment of officers to hold other general elections in the state and the election shall be held in all respects in accordance with the law governing general elections and with the constitutional provisions concerning amendment to that instrument. That the votes cast at said election shall be counted, canvassed, and returns made thereof to the secretary of state in the same manner as in elections for representatives to the Legislature. The result of said election shall be made known by proclamation of the Governor and if a majority of all the qualified electors who voted at said election upon the proposed amendment shall have voted 'Yes' said amendment from the date of said proclamation shall be valid to all intents and purposes as a part of the Constitution of Alabama and as an article thereof.

"Section 6. That the expenses of the election herein provided for and the costs of the publication of the notices shall be paid out of the state treasury in the same manner as the expenses of other general elections are paid.

"Section 7. At the beginning of each fiscal year the state highway commission shall require the state highway engineer to make a statement in writing to the state treasurer of all monies which the state highway department may require for carrying on the work of this department for the coming year the amount so estimated as the needs of the state highway department shall be then set aside by the state treasurer for the exclusive use of the state highway department. All surplus left over in the hands of the state treasurer from the sale of motor vehicle licenses shall be placed at interest in a bank or banks of the state of Alabama. The state treasurer shall deposit these funds in the bank offering the highest interest for the use of the money and where more than one bank makes the same bid the funds shall be prorated between them, but the bid of no bank shall be considered where there is any question of the solvency of said bank and in determining this solvency the treasurer shall require in writing the opinion of the state superintendent of banks.

"Approved Sept. 30, 1919."

The bill avers that the "road bond amendment" was and is void and has not become a part of the Constitution of Alabama, and alleges five grounds or reasons in support of the averment that the "road bond amendment" is invalid and ineffectual, viz.:

(1) That the election on said amendment was not ordered and the day of the election fixed by the Legislature, as required by the Constitution, but that the Legislature delegated this power and authority to the Governor of the state.

(2) That said amendment was improperly and illegally submitted to the Governor for his approval or disapproval; that the Governor of the state amended and materially

changed the said amendment; and that thereafter the Legislature did not readopt same and make it its own, as required by section 284 of the Constitution;

(3) That said amendment was not properly and legally advertised in the Governor's proclamation as required by section 284 of the Constitution and by the Acts of the Legislature of 1915, page 602.

(4) That the resolution passed by the Legislature proposing said amendment contained other matters of a legislative nature, not germane to said amendment, which said matter is embraced in section 7 of said resolution, contrary to the provisions of section 284 of the Constitution.

(5) That the language of said amendment is so vague and indefinite that its meaning is incapable of ascertainment, and that it is therefore incapable of enforcement and therefore void.

Under the caption "Mode of Amending the Constitution," the Constitution of Alabama contains the following provisions (with others in section 286 not presently important):

"Sec. 284. Amendments may be proposed to this Constitution by the Legislature in the manner following: The proposed amendments shall be read in the house in which they originate on three several days, and, if upon the third reading three-fifths of all the members elected to that house shall vote in favor thereof, the proposed amendments shall be sent to the other house, in which they shall likewise be read on three several days, and if upon the third reading three-fifths of all the members elected to that house shall vote in favor of the proposed amendments, the Legislature shall order an election by the qualified electors of the state upon such proposed amendments, to be held either at the general election next succeeding the session of the Legislature at which the amendments are proposed or upon another day appointed by the Legislature, not less than three months after the final adjournment of the session of the Legislature at which the amendments were proposed. Notice of such election, together with the proposed amendments, shall be given by proclamation of the Governor, which shall be published in every county in such manner as the Legislature shall direct, for at least eight successive weeks next preceding the day appointed for such election. On the day so appointed an election shall be held for the vote of the qualified electors of the state upon the proposed amendments. If such election be held on the day of the general election, the officers of such general election shall open a poll for the vote of the qualified electors upon the proposed amendments; if it be held on a day other than that of a general election, officers for such election shall be appointed; and the election shall be held in all things in accordance with the law governing general elections. In all elections upon such proposed amendments, the votes cast thereat shall be canvassed, tabulated, and returns thereof be made to the secretary of state, and counted, in the same manner as in elections for representatives to the Legislature; and if it shall thereupon appear that a majority of the qualified electors who voted at such election upon the proposed amendments voted in favor of the same, such amendments shall be valid to all intents and purposes as parts of this Constitution. The result of such election shall be made known by proclamation of the Governor. Representation in the Legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments.

"Sec. 285. Upon the ballots used at all elections provided for in section 284 of this Constitution the substance or subject-matter of each proposed amendment shall be so printed that the nature thereof shall be clearly indicated. Following each proposed amendment on the ballot shall be printed the word 'Yes' and immediately under that shall be printed the word 'No.' The choice of the elector shall be indicated by a cross mark made by him or under his direction, opposite the word expressing his desire, and no amendment shall be adopted unless it receives the affirmative vote of a majority of all the qualified electors who vote at such election.

"Sec. 287. All votes of the Legislature upon proposed amendments to this Constitution, and upon bills or resolutions calling a convention for the purpose of altering or amending the Constitution of this state, shall be taken by yeas and nays and entered on the journals. No act or resolution of the Legislature passed in accordance with the provisions of this article, proposing amendments to this Constitution, or calling a convention for the purpose of altering or amending the Constitution of this state, shall be submitted for the approval of the Governor, but shall be valid without his approval."

After the houses had reached an agreement upon the measure (known as Senate Bill 218), and after the respective presiding officers of the houses had signed the same in the presence of their respective houses, and after it had been enrolled, the measure went to the Governor, who, on the 27th day of September, 1919, returned it to the Senate along with the following executive message:

"Sept. 27, 1919.

"Gentlemen of the Senate: I herewith return Senate Bill No. 218, without my approval, and suggest the following amendment, which, if made, will meet my objection, namely:

"Amend subdivision B by adding at the end thereof the following words: 'Subject to the approval of the Governor,' so that the concluding paragraph of said subdivision B shall read: 'And all moneys derived from the sale of said bonds shall be expended as the highway department may direct, subject to the approval of the Governor.'

"You will appreciate the importance of the proposed amendment in recalling the fact that under the act the proceeds of the sale of $25,000,000.00 of bonds may be expended by the state highway department, and it is obviously wise to subject this expenditure to the approval of a constitutional officer of the state.

"Respt.    Thos. E. Kilby, Governor."

On the same day, September 27, 1919, the Senate "concurred in the amendment pro-

posed by the Governor to the bill." On the same day, September 27, 1919, the House "concurred in and adopted the amendment proposed by the Governor to the bill." It does not appear from the journals of the houses that the proposed amendment to the Constitution, either as it was when it went to the Governor or as it would or did read with the addition he proposed, was again read after the receipt of the message from the Governor; the journals merely reciting a reading of the executive message and the acceptance by the houses of the proposal therein made by the Governor.

It is averred in the bill that the executive proclamation fixing the date of the election, and notice of election, on the "road bond amendment" was published in one newspaper (the means the act provided) in each county of the state for the minimum period prescribed in section 284 of the Constitution (eight weeks), and not in accordance with the provision of the act (section 4, p. 790, of General Acts 1919), which provided for a minimum publication during "seven successive weeks." Hence the constitutional validity of the "road bond amendment"—as upon the particular objections taken and stated ante against its validity—is presented for decision by this record, and has been exhaustively argued, orally on submission and in briefs since filed, by the respective solicitors.

Steiner, Crum & Weil, of Montgomery, for appellant.

A part of an act may be unconstitutional, and may fail; but if the remainder leaves a complete act, capable of enforcement and showing the legislative intent, the remaining part will stand. Ex parte Mayor and Aldermen of Florence; In re Jones, 78 Ala. 419, headnote 3; Railroad v. Morris, 65 Ala. 193; State v. Davis, 130 Ala. 148, 30 South. 344, 89 Am. St. Rep. 23; Bell v. State, 115 Ala. 87, 22 South. 453; Harper v. State, 109 Ala. 28, 19 South. 857; Yerby v. Cochrane, 101 Ala. 541, 14 South. 355; State v. Rogers, 107 Ala. 446, 19 South. 909, 32 L. R. A. 520; Shehane v. Bailey, 110 Ala. 309, 20 South. 359.

The state Constitution is a limitation of powers; its mandates are supreme. Section 284 is mandatory; the Legislature is bound by its requirements, when it seeks to amend it. This applies, not only to methods, but to questions of time. An amendment voted on without a compliance with its requirements is void. Collier v. Frierson, 24 Ala. 100. Erwin v. Nolan (Mo.) 217 S. W. 837; Cartledge v. Wortham, Sec. of State, 105 Tex. 585, 153 S. W. 297; Ellingham v. Dye, 178 Ind. 374, 99 N. E. 1, Ann. Cas. 1915C, 200, and authorities cited therein; Perry County v. R. R. Co., 58 Ala. 546, 555, 556; State v. Dovis, 20 Nev. 220, 19 Pac. 894; State v. Marcus, 160 Wis. 354, 152 N. W. 419, headnote 6; Ensley Development Co. v. Powell, 147 Ala. 300, 40

South. 138, headnote 2; State ex rel. Woodward v. Skeggs, 154 Ala. 249, first and second headnote, 46 South. 268; State v. Tooker, 15 Mont. 8, 37 Pac. 840, 25 L. R. A. 560 (this case quotes from and upholds Collier v. Frierson, supra); Oakland Paving Co. v. Hilton, 69 Cal. 510, 11 Pac. 3; Koehler v. Hill, 60 Iowa, 543, 554, 14 N. W. 738, 15 N. W. 609 (follows Collier v. Frierson, supra); Endlich on Int. of Statutes, § 433; Weaver v. Lapsley, 43 Ala. 224; Cooley, Const. Limitations (4th Ed.) 94, 95; Coleman v. Eutaw, 157 Ala. 327 et seq., 47 South. 703; Realty Co. v. City of Mobile, 181 Ala. 184, 61 South. 248.

The court sought, in the preceding case, to differentiate it from Coleman v. Eutaw, 157 Ala., supra, and held that, while the Constitution is mandatory, a substantial compliance with its mandates was all that was necessary (the question in both cases being on the preparation of the ballot). However, this opinion was by a divided court, and candor forces us to say that a careful reading of both the majority opinion, and the dissenting opinion leads us to the conclusion that the dissenting opinion, written by Justice McClellan and concurred in by Justice Anderson, is more in keeping with the decisions of other states as well as with our own. Stephens v. People, 89 Ill. 337; People v. Palmer, 91 Mich. 283, 51 N. W. 999; McCrary on Elections, § 153, footnote 2; 9 Ruling Case Law, p. 995; Francis v. Peevey, 132 Ala. 58, 31 South. 372; Finklea v. Farish, 160 Ala. 230, 49 South. 336; Taylor v. Hutchinson, 145 Ala. 206, 40 South. 108; Miller v. Marx, 55 Ala. 322, cited in note 16 L. R. A. 284; McBee v. Brady, 15 Idaho, 761 et seq., 100 Pac. 97; Utter v. Moseley, 16 Idaho, 274, 100 Pac. 1058, 133 Am. St. Rep. 94, 18 Ann. Cas. 723; State v. Powell, 77 Miss. 543, 27 South. 927, 48 L. R. A. 652 (this case, after being a leading case for 14 years, was overruled by a divided court in State v. Jones, 106 Miss. 522, 64 South. 241); Woodward v. Skeggs, 154 Ala. 249, 46 South. 268; Crawford v. Gilchrist, 64 Fla. 41, 59 South. 963, Ann. Cas. 1914B, 916; Bd. of Rev. Jefferson Co. v. State, 172 Ala. 139, fifth headnote, 54 South. 757; Tuscaloosa v. Commissioners, 173 Ala. 724, 54 South. 763; Hatch v. Stoneman, 66 Cal. 632, 6 Pac. 734 (as to time); Stephens v. Rafter, 89 Ill. 337, 2d headnote; People v. Sholem, 294 Ill. 204, 128 N. E. 377 (pamphlet); People v. Luce, 74 Misc. Rep. 551, 133 N. Y. Supp. 10; People v. Porter, 6 Cal. 26; People v. Martin, 12 Cal. 409; 9 Humph. (Tenn.) 208, 49 Am. Dec. 706; State ex rel., etc., v. Donaghey, 106 Ark. 68, 152 S. W. 746; Stein v. Leeper, 78 Ala. 518; State ex rel. Miller v. Taylor, 22 N. D. 362, 133 N. W. 1046; Weaver v. Lapsley, 43 Ala. 224; Little v. Foster, 130 Ala. 163, 30 South. 477; State v. McGough, 118 Ala. 166, 24 South. 395; Jones v. McDade, 200 Ala. 231, headnote 10, 75 South. 988, citing and upholding Collier v. Frierson, supra.

Whether an act required to be done by sec-

tion 284 of the Constitution, in amending the Constitution, has been done, is determined by a compliance with section 284 itself, and not with the directions of the act or resolution proposing the amendment.    Jones v. McDade, 200 Ala. 231, headnote 10, 75 South. 988.

When a statute requires a thing to be done, or done in a particular manner, nullification is the usual consequence of disobedience. Toole v. State, 88 Ala. 162, 7 South. 42.

Where the law fixes no time for an election, leaving that to be determined by some one else named in the statute, after the happening of a condition precedent, it is essential to the validity of the election that it be called and the time fixed by the very agency designated by law and none other.    Stephens v. Rafter, 89 Ill. 337, second headnote; People v. Palmer, 91 Mich. 289, 51 N. W. 999; People v. Porter, 6 Cal. 26; People v. Martin, 12 Cal. 409; Koehler v. Hill, 60 Iowa, 544 et seq., 14 N. W. 738, 15 N. W. 609.

The Governor's veto or approval of the proposed amendment would have availed nothing. It would have been a mere nullity. Const. § 287; Hollingsworth v. Virginia, 3 Dall. 378, 1 L. Ed. 644; State v. Mason, 43 La. Ann. 590, 9 South. 776; 25 Neb. 864, 41 N. W. 981. But when he amended it, thereby making a material change therein, he committed an act of usurpation, which could be made legal only by readoption and ratification as prescribed by section 284 of the Constitution. Hall v. Hall, 43 Ala. 489, headnote 10, 94 Am. Dec. 703; Scruggs v. Mayor, etc., Huntsville, 45 Ala. 222; Norton v. Shields, 44 Ala. 180, 181, 182.

The Governor, by adding a new condition to the amendment, not only acted without authority of law, but rendered the entire amendment void. Dorsey's Case, 7 Port. 293 et seq.; Patton v. Watkins, 131 Ala. 387, headnote 2, 31 South. 93, 90 Am. St. Rep. 43.

The amendment, as amended by the Governor, presented an entirely new amendment, and, being sent back to the Legislature on the last (fiftieth) legislative day, was not, and could not have been, readopted by the Legislature as required by section 284 of the Constitution. Yancey v. Waddell, 139 Ala. 524, 526, 36 South. 733; Jones v. McDade, 200 Ala. 230, 75 South. 988; Moog v. Randolph, 77 Ala. 597, 599, 606; Ex parte Hardy, 68 Ala. 304, 318, headnote 8; Sayre v. Pollard, 77 Ala. 608; Jones v. Hutchinson, 43 Ala. 721; State v. Marcus, 160 Wis. 354, 152 N. W. 419, 424, 425, 426; Crawford v. Gilchrist, 64 Fla. 41, 59 South. 963, Ann. Cas. 1914B, 916; Hall v. Hall, 43 Ala. 489, 10 headnote, 94 Am. Dec. 703; Texas v. White et al., 7 Wall. 700, 766, 19 L. Ed. 227; Ex parte Norton v. Shields, 44 Ala. 183; Scott v. Jones, 5 How. 343, 12 L. Ed. 181; Luther v. Borden, 7 How. 1, 42, 47, 48, 49, 12 L. Ed. 581; Cooley, 48, 49, 29, 30, 31; Scruggs v. Mayor of Huntsville, 45 Ala. 220, 222, 223; Collier v. Frier-

son, 24 Ala. 100; State v. Buckley, 54 Ala. 599; State ex rel. Little v. Foster, 130 Ala. 160, 161, 30 South. 477 (citing Fox v. McDonald, 101 Ala. 71, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98); Walker v. Griffin, 60 Ala. 361, 364, 365, 366; Koehler v. Hill, 60 Iowa, 544, 14 N. W. 738, 15 N. W. 609; Stein v. Leeper, 78 Ala. 521.

The Legislature cannot delegate a power to a department or agent, other than that which the Constitution allows.    Fox v. McDonald, 101 Ala. 51, second headnote and page 65, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98; Clark v. Mobile, 67 Ala. 220; Stephens v. People, 89 Ill. 337; People v. Palmer, 91 Mich. 289, 51 N. W. 999; 3 Michie, § 48, p. 213; People v. Porter, 6 Cal. 26; People v. Martin, 12 Cal. 409; State ex rel. City of Birmingham, 172 Ala. 148, 149, 14 South. 757; Cartledge v. Wortham, 105 Tex. 585, 153 S. W. 297; Ellingham v. Dye, 178 Ind. 374, 99 N. E. 1, Ann. Cas. 1915C, 200; People v. Scholem, 294 Ill. 204, 128 N. E. 377.

The Legislature could not delegate an authority or power, the duty to exercise which was placed by the Constitution upon it alone, especially when this authority or power carried with it the exercise of discretion.    Schultes v. Eberly, 82 Ala. 242, 243, 2 South. 345, 346; Railroad Co. v. Moore, 36 Ala. 371.

Mandamus would not lie to compel the Governor to order the election and fix the date thereof, in the event he had failed or refused so to do.    Railroad Co. v. Moore, 36 Ala. 371; Ex parte Echols, 39 Ala. 698-700, 88 Am. Dec. 749; State ex rel. Light v. Foster, 130 Ala. 160, 161 (citing Fay v. McDonald, 101 Ala. 71, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98); State ex rel. Plock v. Cobb, 64 Ala. 127; Ex rel. Higdon v. Jelks, as Governor, 138 Ala. 115, first headnote, and pages 121 and 122, 35 South. 60; Turner v. Henderson, Gov., 199 Ala. 244 et seq., 74 South. 344; Norton v. Shields, 44 Ala. 180, 181, 182, 183.

While the election held for the purpose of voting on the proposed amendment was a special election, it was not such a "special election" as is contemplated by article 19, p. 354, of the Code, authorizing the Governor to direct or fix the date upon which it should be held, but was such a special election as is contemplated and provided for by the Constitution (section 284) and by the acts of the Legislature of 1915 (Acts 1915, p. 620), which especially provides for special elections for amending the Constitution.    Const. § 284. Code, art. 19, §§ 439, 440, 441, pp. 354, 355. Acts 1915, p. 602.

There is no room here for construction; the language of section 284 is clear and unambiguous.    Ex parte Mayor, etc., 78 Ala. 423; State v. McGough, 118 Ala. 166, 167, 24 South. 395; Cooley's Const. Lim. 68; State ex rel. Miller v. Taylor, 133 N. W. 1046 (22 N. D. 362, and note); Fulton v. State, 171 Ala. 578, 54 South. 688; Hillaird v. State,

100 Ala. 634, 13 South. 756; Maxwell v. State, 89 Ala. 150, 7 South. 824.

Contemporaneous construction cannot avail to sustain this amendment. Sadler v. Langham, 34 Ala. 311. and 335; Robertson v. McGough, 118 Ala. 159, 24 South. 395, 397; Lehman, etc., Co. v. Robinson, 59 Ala. 219, 241; Little v. Foster, 130 Ala. 163, 30 South. 477; Gibbons v. M. & G. N. R. Co., 36 Ala. 437; Birmingham M. R. Co. v. Jacobs, 92 Ala. 197, 9 South. 320, 12 L. R. A. 830; Taylor v. Hutchinson, 145 Ala. 206, 207, 40 South. 108.

Courts have nothing to do with the justice, wisdom, policy, or expediency of the law. McBee v. Brady, 15 Idaho, 761, 100 Pac. 97; 10 Amer. Digest, Cent. Ed. p. 1426, and cases cited; People v. Luce, 74 Misc. Rep. 551, 133 N. Y. Supp. 10, fifth headnote; 8 Cyc. p. 851, and numerous cases cited in notes; Collier v. Frierson, 24 Ala. 100.

If act of Legislature is repugnant to the Constitution, it is the duty of the court to so declare. Dyer v. Tuskaloosa Bridge Co., 2 Port. 303, 27 Am. Dec. 655.

The Legislature cannot overstep the Constitution. Fulton v. State, 171 Ala. 572, 54 South. 688, 693; Woodward v. Skeggs, 154 Ala. 249, 46 South. 268; Ex parte State, 52 Ala. 231, 23 Am. Rep. 567.

The Legislature cannot alter, contract, or expand constitutional provisions. Bd. Rev. Jeff. Co. v. State ex rel. City of Birmingham, 172 Ala. 139, and fifth headnote, 55 South. 757; Tuscaloosa v. Ct. County Com'rs, 173 Ala. 724, 54 South. 763.

The Legislature has no power or authority to incorporate, in a joint resolution proposing amendments to the Constitution, any matter, except the amendment proposed and the question and manner of submitting same. McBee v. Brady, 15 Idaho, 761, 100 Pac. 97.

J. Q. Smith, Atty. Gen., Henry P. White, Asst. Atty. Gen., James J. Mayfield, of Montgomery, N. D. Denson & Sons, of Opelika, Smiths, Young & Leigh, of Mobile, Horace Stringfellow, of Montgomery, G. W. L. Smith, of Brewton, and Matt H. Murphy, of Birmingham, for appellees.

Section 248, Const. 1901, provides two separate matters: (a) The making of a proposal; and (b) the ordering by the Legislature of an election upon such proposal. The right (a) is vested in the Legislature as an entity other than as a law-making body; while the power (b) to order an election is vested in it in its law-making capacity. The Legislature could have made the proposal by one act and ordered the election by another. In the first event, the approval would not have been required, while in the second it would have. But the Legislature can join the proposal, in which event the approval of the Governor is necessary to that part of the act which provides for an election, and is subject to amendment. 200 Ala. 330, 76 South. 95. Where the Legislature has the

right to legislate, it may validly delegate the administration to other agencies. 199 Ala. 9, 74 South. 51; 182 Ala. 357, 62 South. 749; 184 Ala. 96, 63 South. 977; 245 U. S. 389, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1913B, 856. The Constitution is always interpreted in the light of the common law, and, if it is not the first Constitution, then, in the light of its predecessors. 52 Ala. 42; 55 Ala. 576; 53 Ala. 570; 58 Ala. 396; 45 Ala. 496; 58 Ala. 594; 65 Ala. 193; 70 Ala. 145; 77 Ala. 606; 142 Ala. 98, 38 South. 679; 34 Ala. 216. All reasonable presumptions are indulged in favor of the constitutionality of the act. 154 Ala. 274, 45 South. 183. There is no limit on the legislative power, except such as is written in the Constitution. 160 Ala. 230, 49 South. 366; 194 Ala. 591, 69 South. 723. Where the act in question prescribes a rule of purely governmental policy, or relates merely to the conduct and administration of public affairs, it must be repugnant to the Constitution beyond a reasonable doubt, before it is so declared. 154 Ala. 294, 45 South. 418, 15 L. R. A. (N. S.) 340, 129 Am. St. Rep. 57; 166 Ala. 366, 52 South. 61; 193 Ala. 289, 69 South. 466; 182 Ala. 492, 62 South. 77, Ann. Cas. 1915D, 436; 187 Ala. 411, 65 South. 942; 197 Ala. 47, 72 South. 330, Ann. Cas. 1918D, 869; Cooley's Const. (7th Ed.) 239–244; 148 Ala. 402, 42 South. 676, 8 L. R. A. (N. S.) 888, 121 Am. St. Rep. 67; 101 Ala. 51, 13 South. 416, 21 L. R. A. 529, 46 Am. St. Rep. 98; 193 Ala. 305, 69 South. 466; 185 Ala. 358, 64 South. 13, L. R. A. 1915D, 98.

The proposal to amend the Constitution, to have any force and effect, must be submitted to and adopted by a vote of the people, while the act of the Legislature ordering the legislation is final and complete when it has been adopted and approved, and does not have to be submitted to the vote of the people. There is no requirement that the act providing for the election shall be passed by three-fifths vote, while this requirement is necessary to a proposal to amend. It requires that the vote be taken by yea and nay, and be entered upon the journal, upon a proposal to amend; but this is not required after the act calling the election. Mandamus would have lain against the Governor, if he had refused to give notice and to fix the time for the election, 36 Ala. 371; 199 Ala. 244, 74 South. 344; 78 Ill. 382; 57 Neb. 464; 77 South. 1096; 68 Tex. 418, 4 S. W. 596, 2 Am. St. Rep. 505; 76 Cal. 545, 18 Pac. 766, 9 Am. St. Rep. 252; 5 Cal. App. 265, 90 Pac. 47; 125 Ky. 571, 101 S. W. 954; 54 Me. 95, 89 Am. Dec. 722; 26 Okl. 403, 109 Pac. 558, 138 Am. St. Rep. 964; 146 N. C. 534, 60 S. E. 418, 125 Am. St. Rep. 489; 73 Pac. 690; 70 Ala. 546.

McCLELLAN, J., after stating the case, delivered the opinion of the court.

The first objection directed against the "road bond amendment" is that by the act

purporting to submit the proposed amendment to the electorate, the Legislature expressly undertook, through section 4, to delegate to the Governor the power to fix the date on which the election upon this proposal should be held. To soundly determine the merit of this objection it is appropriate to orderly, logical treatment to reiterate in premise some of the obvious truths that by written Constitutions have developed.

[1, 2] The Constitution of Alabama, like that of the nation and of the other states, is the supreme law within the realm and sphere of its authority. Subject only to the restraints resulting from the Constitution of the United States, the Constitution of Alabama is the highest form and expression of law that exists in this state. The source of its creation and the character of its sanction, viz. the people's deliberate will, invest the Constitution with its paramount quality. The Constitution's control is absolute wherever and to whatever its provisions apply; and every officer, executive, legislative, and judicial, is bound by oath (section 279) to support the Constitution, to vindicate and uphold its mandates, and to observe and enforce its inhibitions without regard to extrinsic circumstances. It commits to no body, officer, or agent any authority or power whatever to change or modify or suspend the effect or operation of its mandates or its prohibitions; the instrument itself prescribes the exclusive modes by which it may be altered or amended, or its effect and operation changed. Otherwise than as these exclusive modes contemplate and authorize the Constitution's alteration, its character is permanent, its force and influence enduring. Both of these exclusive modes are plainly stated in sections 284–287 of the Constitution. Only through a constitutional convention, called and convened as provided in the existing organic law, or through amendment proposed and adopted as provided in the existing organic law, can the Constitution be altered or changed. It is with the latter mode we are now concerned.

Upwards of 60 years ago this court had occasion to consider and to pronounce constitutional principles referable to the change by amendment of the organic law. The opinion then delivered by Justice Goldthwaite established Collier v. Frierson, 24 Ala. 100, as a leading authority in our country on the subject under consideration. Many courts of the highest repute, as well as text-writers, have accorded the doctrine there announced the unreserved acceptance its obvious soundness deserves, and have given that pronouncement its own great place in the constitutional jurisprudence of the republic. With a brevity, and also a comprehension, that is notable and gratifying, it was there said:

"We entertain no doubt, that, to change the Constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The Constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the Legislature, or any other department of the government, can dispense with them. To do so would be to violate the instrument which they are sworn to support, and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment, which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

But recently this court approvingly reproduced the quoted pronouncement, and declared, in orderly sequence and in expression of unquestioned judicial power, that it was the function of the judiciary to determine whether the prescriptions of the organic law itself have been observed in the effort to amend the Constitution. Jones v. McDade, 200 Ala. 230, 233, 75 South. 988. This doctrine of Collier v. Frierson accords with and, in a sense, illustrates the even broader constitutional principle this court thus expressed (through Stone, J.), by approving quotation from Cooley, in Perry County v. Railroad Co., 58 Ala. 546, 556:

"We adopt, as our own, the language of one of the soundest and most thorough thinkers and jurists, who have written on the subject of organic law, embodied in our Constitutions: 'The courts tread upon very dangerous ground when they venture to apply the rules, which distinguish directory and mandatory statutes, to the provisions of a Constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules, by which all the departments of the government must at all times shape their conduct. * * * We are not, therefore, to expect to find in a Constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in our instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate, as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only.' Cooley Const. Lim. 78."

[3-5] The provisions of the Constitution providing for its amendment are mandatory,

not directory—binding on the people themselves and concluding every department, body, officer, and agency under its authority. Authorities supra; 12 C. J. pp. 688, 689. The power granted the Legislature to propose amendments to the Constitution is a particular, special power, not possessed by the Legislature otherwise than through grant by the instrument itself. It can only be exercised in the mode prescribed, and the mode defined is the measure of the power. Collier v. Frierson, supra; Oakland, etc., Co. v. Hilton, 69 Cal. 479, 514, 11 Pac. 3; Jones v. McDade, supra. It results from the system and the provision of the Constitution that in proposing amendments to that instrument, to be voted upon by the electorate, the Legislature is not exercising its other power to make laws. Jones v. McDade, supra; Livermore v. Waite, 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 313, 315, 316; 12 C. J. p. 693; 6 R. C. L. § 19, pp. 28, 29. Recognition of this last-stated principle—resultant, as it is, from those previously reiterated—is an essential prerequisite to any sound, logical conclusion upon the objection now being considered. To ignore it or to deny it appropriate effect is to invite error in judgment and to court the affirmation of inexcusable fallacy.

[6] Since "every requisition which is demanded by the instrument itself," in defining the mode of its amendment, is mandatory, and since to omit the observance "of any one [of them] is fatal to the amendment," the determination of the inquiry raised by the objection now under consideration turns upon the effect to be accorded the provisions of section 284, whereby it is provided that the "Legislature shall order an election by the qualified electors of the state upon such proposed amendments, to be held either at the general election next succeeding the session of the Legislature at which the amendments are proposed or upon another day appointed by the Legislature, not less than three months after the final adjournment of the session of the Legislature at which the amendments were proposed"; it being further provided in section 284 that the election required should be held "on the day so appointed." In the act proposing this "road bond amendment" the Legislature undertook, through section 4, expressly to delegate to the Governor the function and the discretion to appoint the date upon which the election on this amendment should be held, thereby leaving wholly unexercised by the Legislature the discretionary power granted to it to appoint the day for such election. The meaning and effect of the provisions of the Constitution defining exclusively the agency or entity to which the discretion to appoint the day for such election is committed, and by which that discretion must be exercised, is positive and plain, and neither allows nor requires any recourse to construction to derive its unmistakable intent or to understand its unavoidable demand. The language itself avows that intent. Reference to the "Legislature" in section 284 is as distinct a designation of a constitutional entity as any reference elsewhere in the organic law to the Governor, to the Supreme Court, or to any other governmental agency mentioned therein is a distinct designation of the particular constitutional entity specified in the particular text of the instrument. If the Governor had been designated as the repository of the discretionary power to appoint the day for such elections, no one would assert that such power could be delegated to the Legislature, or to any other entity to exercise the discretion that had been exclusively granted to the Governor.

Obviously, the reposition by the Constitution of such a power in a defined entity, to accomplish a particular purpose of the gravest constitutional character, is a denial of its grant to or its rightful exercise by any other than the entity to which the Constitution itself commits the power to appoint the day for elections on proposed amendments to the Constitution. It is not even contended on this appeal that the designation of the repository of this discretionary power is not the Legislature. We deduce from the argument and from the briefs for the appellees this, as the substance and legal effect of the contention for the appellees: That the designation of the Legislature as the repository of this power is to that entity in its law-making capacity, in which realm of legislative action it has been often held permissible for the Legislature to delegate to others the administration of the law the Legislature has validly enacted. The contention cannot be supported, much less vindicated. If anything other than the plain, unambiguous terms of the organic law were needed to further demonstrate that the Constitution reposed this power in the Legislature as an entity—not in its capacity to make laws, to enact statutes —that unnecessary, but additional, factor is found in these indubitable terms in section 287:

"No act or resolution of the Legislature passed in accordance with the provisions of this article, proposing amendments to this Constitution, or calling a convention for the purpose of altering or amending the Constitution of this state, shall be submitted for the approval of the Governor, but shall be valid without his approval."

It is to be observed that the form of expression employed is positive and prohibitory, and that it manifests an intent of the most emphatic character. Elsewhere in the Constitution the Legislature as a law-making institution is treated in the greatest detail, and the way in which this function of the Legislature shall be performed is prescribed with marked particularity. Under the Constitution the Governor is made a part of the law-making power, the legislating power.

He may propose amendments to legislative products; he may veto them; he may allow them to become law by the efflux of the time prescribed in the Constitution; or the Legislature may refuse his proposed amendments and give the bill the form and effect of law, notwithstanding the action of the Governor. No bill can become a valid law under the Constitution of this state that is not presented to the Governor. The quoted prohibitory terms of section 287 are directly opposed to vital features of the Constitution's system for making laws, for enacting statutes, in that section 287 forbids the submission to the Governor of acts or resolutions calling a constitutional convention or proposing amendments thereto, thereby expressing the indubitable intent to take the subject of the Constitution's change or amendment without the law-making power of the Legislature. This view is even further demonstrated by the provision of section 125—the section which deals with the Governor's participation in the process of passing laws, as well as action by the Legislature in its law-making capacity —where it is provided:

"Every vote, order, or resolution to which concurrence of both Houses may be necessary, *except* on questions of adjournment and the bringing on of elections by the two houses, and *amending this Constitution*, shall be presented to the Governor. * * *" (Italics supplied.)

This exception with respect to the amending of the Constitution is set down in the very body of the instrument, where legislative power was the subject of constitutional consideration, thereby also evincing the same intent with respect to the mode of amending the Constitution that is so unmistakably declared in the distinct article (sections 284–287) devoted to the "Mode of Amending the Constitution."

The acceptance of this contention for appellees would involve the interpolation of qualifying terms not written in the Constitution. Its effect upon the instrument's plain meaning would be to substitute for the Constitution's specific designation of the Legislature as the exclusive repository of this particular power a prescription that by law the Legislature should appoint a day upon which such elections should be held. When the makers of the Constitution intended to treat the Legislature in its capacity of law-maker —a field and process entirely distinct from its function in formulating and proposing amendments to the Constitution, as has been before noted in this opinion—they left the constitutional purpose in no rational doubt. The sections of our Constitution to which we will, at this point, allude are pressed by counsel for appellees as furnishing analogies, supporting considerations of their interpretation of "Legislature" as employed in section 284. They are sections 156, 161, 190, and 243.

In section 156 the provision with respect to the time and place of holding elections for members of this court is that they shall be fixed "by law"; in section 190 the provision is that the "Legislature shall pass laws * * * to regulate and govern elections"; in section 243 the provision confers certain powers "upon the Legislature, whose duty it shall be to pass laws" regulating railroad tariffs, etc. In each of these sections the constitutional intent is expressly referred to the Legislature in its capacity to make laws, to enact statutes. In section 161 the same intent is made patent through the use of the words "to provide," in empowering the Legislature to continue the holding of courts when their judges fail to attend regular terms.

Code, §§ 440, 441, vesting discretion in the Governor with respect to the dates for special elections, are referable to what is now (in part) section 190 of the Constitution, to which we have first alluded. It was to a like general provision—to that we have just alluded to in section 190—that this court, in May & Thomas Hdw. Co. v. Mayor, 123 Ala. 306, 26 South. 537, referred the ballot form prescribed by the Legislature in submitting the "Birmingham amendment" under the Constitution of 1875, in which there was no provision requiring the Legislature to appoint the day for election on amendments submitted to the electorate, as is one of the prescriptions in the present Constitution. Neither the opinion nor the decision in the May-Thomas Case has any bearing upon this appeal. The old (1875) Constitution having committed to the law-makers the power and enjoined the duty to "pass laws" governing elections, the court referred the action there questioned to that purely legislative authority, the power and duty to "pass laws."

Another analogy pressed for appellees is asserted as upon the provisions of section 4 of article 1 of the Constitution of the United States, which provides:

"The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the Legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators."

The argument pressed is that the Congress has recognized as valid special elections called by a Governor in exercise of a discretion, delegated by the Legislature, to fix the date thereof to fill vacancies in a state's representation in the Congress. Paine on Elections, § 299, is cited to support the asserted analogy. Reference to this provision of section 2 of article 1 of the Constitution of the United States will serve to explain and render unimportant Paine's text in respect of the part cited on the brief:

"When vacancies happen in the representation from any state, the executve authority

thereof shall issue writs of election to fill such vacancies."

Paine, in the same section (299), affirms, and with obvious correctness, that the power conferred by the section last quoted "cannot be delegated by the Governor"; that "it was not competent for the Governor to delegate the power to fix the time of the election, and that the illegality could not be cured by subsequent legislation." Recurring to section 4 of article 1 of the Constitution of the United States, it is evident that the reference to the Legislature is to that body in its capacity as law-maker, the capacity in which such bodies provide the "regulations" mentioned in the section. Such was undoubtedly the view of the Supreme Court in Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717; the court treating the section (4 of article 1) as vesting legislative power in the state, not in the particular body mentioned in the section.

"Analogy, as we all know, is a good servant, but a bad master; for, when master, it does more to blind than it may previously have done to illuminate."

The Prohibitory Amendment Cases, 24 Kan. 700, are strongly relied upon by the appellees to sustain the validity of this amendment. While citing and quoting without the slightest criticism the decision of this court in Collier v. Frierson, 24 Ala. 100, its doctrine was wholly unattended, and declarations were made by Justice Brewer that contradict the very bases upon which the permanency of constitutional government rests and affront the very principles that underlie the employment of written constitutions as the highest expression of the people's will. The California court, in Oakland, &c. Co. v. Hilton, 69 Cal. 479, 497, 11 Pac. 3, 11, said of this Kansas Case:

"The reasoning by which the learned court reached the conclusion it did is not based on any sound legal principles, but contrary to them. Neither the argument nor the conclusion can command our assent or approval. The argument is illogical, and based on premises which are without any sound foundation, and rest merely in assumption."

The dissection and criticism of this decision and opinion (24 Kan. 700) by the California court—only a part of which we have quoted—is commendably mild and incontestably well founded. So recently as 1912, the Kansas court, in State ex rel. v. Sessions, 87 Kan. 497, 124 Pac. 403, pronounced constitutional principles and enforced a conclusion without so much as citing the Prohibitory Amendment Cases—principles and conclusion that the doctrine of the earlier decision would have denied acceptance or attainment. The principles lately announced and applied by the Kansas court are those stated in Collier v. Frierson, and Perry County v. Railroad

Co., supra. The opinion in 24 Kan. 700, is unsound, and cannot be accepted or approved.

Where a mandate of the Constitution is plain and unambiguous, and that mode has not been observed, the judicial duty is likewise plain and inescapable. In the very recent pronouncement made in Ward v. McDonald, 201 Ala. 237, 244, 77 South. 827, 834, it was said, by way of approving quotation from Cooley (7th Ed., p. 105):

"Where, however, no ambiguity or doubt appears in the law, we think the same rule obtains here as in other cases, that the court should confine its attention to the law, and not allow extrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such a case would be to suffer manifest perversions to defeat the evident purpose of the lawmakers. 'Contemporary construction * * * can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries.' "

In State ex rel. v. McGough, 118 Ala. 166, 24 South. 397, it was said:

"Whenever a constitutional provision is plain and unambiguous, when no two meanings can be placed on the words employed, it is mandatory, and courts are bound to obey it. Such a mandate, whether wise or unwise, whether founded upon good reasons or not, is obligatory, and cannot be construed away by the history of the past, or by any mischief that it may be supposed it was intended to remedy."

So, too, this court has written in Little v. Foster, 130 Ala. 154, 30 South. 477, also reproduced in Ward v. McDonald, supra:

"The framers of the Constitution 'must be understood to have intended what they said. * * * We can only learn what they intended, from what they have said. It is theirs to command, ours to obey. When their language is plain, no discretion is left to us. We have no right to stray into the mazes of conjecture, or to search for imaginary purposes.' "

As said in State ex rel. v. McGough, 118 Ala. 166, 24 South. 395, the doctrine of cases like Taylor v. Woods, 52 Ala. 474, cited on brief for appellees, is superseded and inapplicable, where the constitutional mandate is, as here, plain and unambiguous in its terms. Our opinion is, and we so hold in expression of the plain letter and intent of section 284 of the Constitution, that the Legislature omitted, by failing itself to appoint the day for the election, to observe that prerequisite to the valid submission of the "road bond amendment" to the electorate of the state, and that the proposed amendment, not having been constitutionally submitted to an election "so appointed," was and is invalid, and never became a part of the Constitution of Alabama.

This conclusion renders relatively unimportant the other grounds or reasons asserted

against the validity of the "road bond amendment." Nevertheless, it is thought appropriate to state, without finally deciding their merit, the other grounds assigned, thereby noting possible imperfections in submitting amendments to the Constitution that may in the future surely be avoided.

A. The act embodying the proposed "road bond amendment" was submitted to the Governor in plain violation of this provision of section 287:

"No act or resolution of the Legislature passed in accordance with the provisions of this article, proposing amendments to this Constitution, or calling a convention for the purpose of altering or amending the Constitution of this state, shall be submitted for the approval of the Governor, but shall be valid without his approval."

It was the evident design of the provision to remove the Governor from all participation in the process of formulating or perfecting any "act or resolution" of the Legislature in virtue of the authority and power there described.

B. The act here involved having been submitted to the Governor in violation of the above-quoted provision, after its perfection by the judgment of the houses, the Governor returned it with a proposed amendment "to the bill," referring, however, to a paragraph therein that contained the proposed amendment to the Constitution. Thereupon the houses concurred in the Governor's proposed amendment "to the bill"; the journals reciting nothing more than a reading of the Governor's proposed amendment, and being wholly silent as to any reading of the proposed amendment to the Constitution, either as it was before or after the Governor's proposal received the consideration of the houses. The decision in Jones v. McDade, 200 Ala. 230, 75 South. 988, involved no such question as that projected by the matters and acts just stated. There the proposal was in process of formulation in the houses, was in fieri, when the amending was done. Here the Legislature had completed its consideration, at least to the extent of a perfect accord between the houses. Whether a new beginning was necessary in these circumstances is a question of doubtful solution. If the amendment proposed by the Governor was not constitutionally made a part of the proposed amendment to the Constitution, then the electorate did not vote upon an amendment proposed, in a constitutional sense, by the Legislature.

C. The act proposing the "road bond amendment" prescribed a minimum period of publication one week less than the Constitution (section 284) exacts; but the Governor observed the Constitution.

D. In respect of expression, material features of the proposed "road bond amendment" are most remarkable. In terms therein it refers to a fund to be derived from a "state license tax on all automobiles or motor driven vehicles * * * to be levied and collected on all such vehicle privilege license tax now levied or which may hereafter be levied by law. * * *" The language contemplates a tax on a tax—an absurdity, of course. It is said that familiar rules of construction would allow the substitution of "and" for "on" in the quoted phrase. When it is considered that the electorate actually voted upon and for the proposed amendment, thus introducing a factor of constitutional consequence, it is at least doubtful whether the usual rules of construction would be applicable, for who can say the voters intended to express their judgment upon anything different from the amendment as written?

Again: Whether the bonds to be issued under the proposed "road bond amendment" were to carry the pledge or promise of the full faith and credit of the state of Alabama, or were to be but a charge upon, alone to be paid out of, the particular fund derived from the license or privilege tax on motor-driven vehicles, is at least doubtful. If the credit of the state was intended to be pledged to the payment of the bonds, then a state debt would, of course, be thereby created and evidenced; and, if so, it may be inquired whether the general obligation of the state can be imposed alone upon a class, the users of motor-driven vehicles within its borders.

Again: Whether the terms of the proposed "road bond amendment" devoting the proceeds of such taxes to the particular objects enumerated therein are qualified or contradicted by the later broad provisions expressly providing that the funds derived from the sale of the bonds should be expended as the "highway department" may direct, subject to the approval of the Governor, is also a matter of doubt.

E. Section 7 of the act proposing the "road bond amendment" is said to contain matter without any proper relation to the submission of the amendment under the Constitution; that it is but legislation.

We conclude: When it is considered that the design of this effort was to authorize the issue of $25,000,000 in bonds to be sold to purchasers; that the plan selected involved the amendment of the Constitution, which, through section 213, prohibits any new debt against the state except for defined purposes and in stipulated circumstances, pronouncing "absolutely void" every other act incurring debts otherwise, and which, through section 93, inhibits the state from engaging in works of internal improvement, operating a departure from the constitutional policy first declared in the organic law of 1875, it is nothing less than astounding that such a colossal plan and purpose could have progressed through all its stages without some one in authority turning to the Constitution of the state and at least reading its commands as the only

medium through which all the people can and do speak when that instrument's amendment is proposed.

The proposed "road bond amendment" being void, a nullity, the complaining taxpayer, the appellant, is entitled to the injunctive relief he seeks. His bill was not subject to the demurrer. The trial court erred in sustaining the demurrer. The decree is reversed and the cause is remanded.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and MILLER, JJ., concur.

SOMERVILLE, GARDNER, and THOMAS, JJ., dissent.

### On Rehearing.

McCLELLAN, J. (for the court). Before responding to the material, relevant propositions and argument presented in the briefs in support of this application for rehearing, there are some preliminary matters to which attention will be given.

In the original opinion delivered on February 3, 1921, this appeal and the important questions involved in its disposition were treated and considered in the customary, normal manner of judicial deliverance by the highest court of the state of Alabama. That seemed the proper way in which the great duty of this court should be performed. On pages 8 and 9 of the printed brief for the appellees in support of the rehearing it is said:

"The holdings of the court in this case have made a profound impression upon the public mind. In spite of the very clear and forcible logic with which the majority of the court analyzed and decided the questions presented for its consideration, the mind of the public seems to have been utterly unable to follow the argument or to understand the conclusions reached by the majority of the court, and the lay feeling is almost universal that the will of the people has been defeated by a technicality in which there is no substance. The attorneys for appellee do not participate in this feeling. When they read the opinion they now challenge they were impressed with its clearness, its force, its logic, and judicial temper, but were nevertheless encouraged to search for a week link in the argument by a feeling that, whenever there is a consensus of opinion among a large part of the thinking public upon a great public question in which they are deeply interested, a conclusion in conflict therewith may be examined with the hope, at least, if not with an almost superstitious expectation, that some essential consideration has, in some way, been overlooked."

[7] Since the decision on February 3, 1921, declaring that this "road bond amendment" did not become a part of the Constitution, because of the violation of mandatory provisions of the Constitution, there has appeared distinct manifestations of a desire on the part of some to undertake to influence, through a cultivated public clamor, the judges who formulated the judgment, when they came, as they have now, to reconsider that judgment on rehearing. Ignorance, and nothing worse, accounts for some, if not all, of this activity and publicity; ignorance of the distinction between anarchy and constitutional government; ignorance of the imperative necessity to maintain and preserve the independence of the judiciary, a condition that cannot prevail if extraneous circumstances, unrelated to the law or to judicial processes, are countenanced by worthy citizens; ignorance of the fact that judges are bound by oath, as well as by every sense of self-respecting fidelity and responsibility, to enforce the Constitution, an obligation that rests on the conscience of the individual judge, to satisfy which it is given no other judge, or judges, to do, for no judge is made the keeper of the conscience of another judge; ignorance of the fact that no power or authority is conferred on this court or its judges to forgive, condone, or heal violations of plain, unambiguous mandates, prohibitions, or limitations of the Constitution, even if the violation results in the greatest good or promotes a universal benefaction; for, if "forced and unnatural constructions" of plain, unambiguous provisions of the Constitution are accepted by the courts, "they inflict a wound upon the Constitution which nothing can heal." Sadler v. Langham, 34 Ala. 335, where this court, through Stone, J., approved this statement of an absolute judicial rule:

"My rule has ever been to follow the fundamental law as it is written, regardless of consequences."

[8, 9] Recurring now to the thought of the quotation (ante) from the brief supporting the application, this court contemplates with satisfaction the affirmative disavowal, by the great array of counsel representing appellee, of any participation in the unfortunate, wholly ill-founded sentiment there said to have found lodgment in the lay mind that this court had, in its judgment, introduced a "technicality" to defeat the popular will or desire. The state of the "public mind" to which counsel refer would seem impossible of creation or existence in this enlightened state, unless it is assumed that those entertaining the sentiment indicated are unaware or have forgotten that Alabama has a Constitution, supreme and enduring until changed in accordance with its prescriptions, and binding upon all the people, as well as every judge and other officer who has taken his solemn oath to support and vindicate the Constitution. If this "public mind" should consider, as counsel have candidly done in their unreserved disavowal, that all are subject to the paramount government of the Constitution, they would come at once to

know that there is no such thing as a "technicality" when the enforcement of mandates of the Constitution is the judicial action required by the Constitution. The Constitution contains no idle assertions, no meaningless language, no ephemeral purpose, no recognition of the right of even all the people—except through revolution and attendant anarchy—or of the Legislature or of the courts to refuse obedience to its supreme authority, or by evasion or subterfuge to defeat the Constitution as the highest expression of the people's will. The most eminent writer on Constitutions and the jurisprudence that gives them effect (Cooley, p. 88) has said, what all must know, that the court which permits public sentiment to influence a construction of a Constitution that is not warranted by its intent "would be justly chargeable with reckless disregard of official oath and public duty"—a charge that represents the acme of odium and the superlative of infidelity. Now, as ever before, the penalty for the violation of the Constitution is that the product of the offense is a nullity.

It is suggested in brief for appellee on rehearing that the judgment of this court on this appeal will annul the "soldiers' poll tax amendment," resulting in the electoral disqualification of those within its purview, who, because of it, availed of the exemption (until September 30, 1923) there prescribed. The validity or invalidity of the "soldiers' poll tax amendment" is not before this court. Its validity or invalidity cannot be determined in this cause. When, if ever, the question of its validity is presented here in accordance with "due process of law" and the practices of this court, the court will perform its duty in the premises. The sons of Alabama who with honor to their state served in the World War, under the colors of a nation that stood, as always, for the supremacy of right over might, for the observance of the obligations of duty to constitutional government, and for fidelity to the institutions of state that protect the dearest interests of those subject to its blessings and bearing its burdens, desire, we apprehend, the fearless maintenance and vindication of the Constitution of Alabama, regardless of the popularity or unpopularity of the result of the performance of that duty.

[10] It is now insisted in support of the application for rehearing that the "road bond amendment" has acquired a status—by lapse of time (not a year since its proclamation, we may note), by favorable vote of the electorate participating in the election, and by some action (not stated in the record before this court) under the theory that the amendment had been constitutionally adopted—that now precludes judicial consideration; this manifestly from motives attributable to expediency only. It is expressly admitted in brief that the question of the validity of the "road bond amendment" is a judicial question, as was held in the original opinion. The stated contention is rather surprising, in view of the history of this cause, the nature and object of the "road bond amendment," and the thoroughly justified public purpose which prompted the presentation of this cause to this court—"to test" the validity of the "road bond amendment." The vote on the "road bond amendment" was taken on February 16, 1920. The proclamation of the Governor, declaring the "road bond amendment" adopted, was issued on March 1, 1920. This bill to test every suggested objection to the validity of the amendment was filed December 22, 1920, practically 10 months after the executive proclamation was issued. On the argument of the cause in the Supreme Court it was stated that this was a "friendly suit" to test the validity of the "road bond amendment" as upon the several grounds of objection set forth in the pleading, and the court was advised of the hope of all persons interested that prompt decision would be given this very important cause.

If the contention now made is sound, it is manifest that practically all the labor and care bestowed by the court and by counsel upon the distinctly averred objections we were at pains to recite in the "Statement of the Case," ante, were almost utterly vain; that the court, in response to a "test case" made by friendly accord and consent, has engaged its attention and high function in an immaterial, unimportant, chiefly idle performance, not necessary to the determination of the validity of the "road bond amendment," for that the facts making up the above-described status acquired by the "road bond amendment" have never been a matter or subject of doubt or debate; and hence, if the contention now under consideration was well founded and sound, this court could have discharged its whole duty by simply responding to the appeal that "it is too late, under those uncontested circumstances, to invoke the judicial function of deciding whether the 'road bond amendment' was submitted to the electorate in conformity to the Constitution," the electorate having voted thereon and favorably thereto on February 16, 1920. This court is not responsible in the slightest degree for the delay, if such there has been, in submitting the matter to its determination nor is it accountable at all for any consequences or action that intervened or have interposed since the adjournment of the Legislature of 1919. That this cause was brought "to test out" the validity of the "road bond amendment" was both desirable and necessary in view of the object proposed. As its name shows, the "road bond amendment" was designed to authorize the issuance of bonds and their sale to investors in such securities. To induce investors to

buy bonds, it is, of course, essential that their validity shall be beyond question, or that doubts affecting their validity should be removed or composed, since no investor will buy clouded securities; and we apprehend no investor in bonds issued by a state would be favorably inclined to purchase if the highest court of the state offering its bonds on the market was found to be hesitant, for whatever supposed reason or inducement, in maintaining and vindicating the mandates of the Constitution of that state.

Now, as to the merits of the contention last stated: There are decisions declaring that time and action, under Constitutions asserted to have been irregularly or illegally promulgated, preclude such belated judicial inquiry into their validity. The cases of Taylor v. Virginia, 101 Va. 829, 44 S. E. 754, Brittle v. People, 2 Neb. 198, Miller v. Johnson, 92 Ky. 589, 18 S. W. 522, 15 L. R. A. 524, Nevada ex rel. Torryson v. Gray, 21 Nev. 378, 32 Pac. 190, 19 L. R. A. 134, and Secombe v. Kettelson, 29 Minn. 560, 12 N. W. 519, are cited to support this contention. The cases from Virginia and Kentucky, ante, concerned attacks upon the Constitutions as a whole; but, as if to guard its effect from misleading precedent in that state, the Kentucky court declared in Miller v. Johnson, supra, with respect to the amendment of the Constitution, that if the Constitution "provided how its" amendment was to be effected, "unless the [that] manner be followed, the judiciary, as the interpreter of that Constitution, will declare the amendment invalid. Koehler v. Hill, 60 Iowa, 543; State v. Tufly, 19 Nev. 391"—both of which decisions quoted and applied the doctrine of Collier v. Frierson, 24 Ala. 100, which is reproduced in our original opinion. The Brittle and Secombe Cases involved considerations in which the admission into the Union of the states of Nebraska and Minnesota and acts of Congress relating thereto and subsequent approval were important factors in the conclusions there prevailing. None of these four decisions are relevant in fact, or through constitutional principle to the question presented and decided on this appeal. The Torryson Case, supra, invoked the court's interpretation of the requirement for the undefined "publication" of proposed amendments, and, being open to construction, not plain and unambiguous, the court gave effect to contemporaneous construction. It sheds no light here.

[11] The theory that a favorable vote by the electorate, however unanimous, on a proposal to amend a Constitution, may cure, render innocuous, all or any antecedent failures to observe commands of that Constitution in respect of the formulation or submission of proposed amendments thereto, does not prevail in Alabama, where the doctrine of the stated theory was denied, in obvious effect, by the pronouncement 60 years ago of broad, wholesome constitutional principles in Collier v. Frierson, supra, as quoted in the original opinion, ante. The people themselves are bound by the Constitution; and, being so bound, are powerless, whatever their numbers, to change or thwart its mandates, except through the peaceful means of a constitutional convention, or of amendment according to the mode therein prescribed, or through the exertion of the original right of revolution. "The Constitution may be set aside by revolution, but it can only be amended in the way it provides," said Hobson, C. J., in McCreary v. Speer, 156 Ky. 783, 791, 162 S. W. 99, 103.

[12] We come now to the pith of the arguments addressed to and bearing upon the soundness of the adjudication in the original opinion, that the provisions of section 284 of the Constitution, providing that "the Legislature shall order an election by the qualified electors of the state upon such proposed amendments, to be held either at the general election next succeeding the session of the Legislature at which the amendments are proposed or upon another day appointed by the Legislature, not less than three months after the final adjournment of the session of the Legislature at which the amendments were proposed," imposed upon the Legislature as an entity, not in its law-making capacity, the nondelegable duty to fix the time for the election there contemplated. Instead of fixing the time as the Constitution required, the Legislature expressly, in section 4 (Gen. Acts 1919, p. 790), undertook to delegate that duty and its performance to the official, the Governor, and so without any limit or direction other than may be implied from the fact that the Constitution (section 284) forbade the holding of an election on a proposed amendment within three months of that Legislature's adjournment. So far as the there manifested will of the Legislature was concerned, the present Governor might have set the election at any date during his term of office, which expires in 1923, no power anywhere residing to control that official's discretion, if it warrantedly reposed in that official.

The question thus made and the action contemplated was and is important in the highest degree, unless all conservative and preservative considerations that written Constitutions have developed in this republic are disregarded. It is not a technical question; it is a constitutional question. Even the layman would so understand it, if he would give attention to the nature, purpose, character, and supremacy of the organic law under which he lives, under which he holds—in confident reliance upon the preservation of all provisions of the Constitution—the vested, unimpairable interests of life, liberty, and

property. To preserve it against violation; to detect its infringement; to discover the "sappers and miners" of the authority of any provision in it; to play the searchlight of scrutiny upon the so-called "liberal" constructionist, who would find an excuse to escape the effects of its mandates, prohibitions, or limitations by recourse to construction when its terms and intent are plain and unambiguous—these are among the primary duties of citizens wisely jealous of the preservation of the Constitution. Able as are the arguments presented against the stated ruling of this court, we find in them no sound contestation of these primary premises of the conclusion prevailing, viz. that the power to propose amendments to the Constitution itself is a special power, not inherent in the Legislature, to be exercised in strict conformity to the mode and the manner provided by article 18 of the Constitution. Collier v. Frierson, 24 Ala. 100; 12 C. J. pp. 687, 689.

Quite to the contrary of a contestation of the stated premises, the brief (page 10) for appellee in support of the application for rehearing expressly concedes that, if the provisions of section 284, relating to the appointment by the Legislature of the date or time for election on proposed amendments to the Constitution, are not referable to action by the Legislature in its capacity of law-maker—as was decided in the original opinion ante— the argument prevailing with the court "is conclusive"; and again at page 16 the brief for appellee conceded that, if the power to appoint the time for the election on proposed amendments is reposed in the Legislature as an entity, not in its capacity as law-maker, "the conclusion" prevailing "necessarily follows." In the brief for rehearing of Mr. Stringfellow "for interested parties," it is also frankly conceded that—

"If the ordering of the election upon a proposed amendment to the Constitution is not committed to the Legislature in its law-making capacity, the writer agrees that such power of delegation does not exist."

So, in view of the eminence and great ability of the counsel who have scrutinized the bases—in logic, fact and law—for the conclusion prevailing on original consideration and stated in that opinion, this court cannot be mistaken in assuming that the question, the controlling inquiry, projected and pressed on this application for rehearing, is one of construction, only, of the before-quoted provisions of section 284 of the Constitution and those bearing upon or related to the particular character, quality and dignity of the power of appointing the time for the holding of an election on a proposed amendment to the Constitution. Such was the real crux of the inquiry considered and decided in the original opinion; but the arguments

205 ALA.—26

project and define this distinct, controlling question much more clearly than did the arguments, oral and in brief, on original submission. The present review and reconsideration is thus reduced in scope and subject-matter to the point of an "irreducible minimum." The proposition earnestly urged is that the function and service of the Legislature in performance of its duty under article 18 of the Constitution, in proposing and submitting amendments to the Constitution, is divisible into two distinctive processes or actions, in the order to be stated, viz. formulating, upon constitutionally attained agreement of the two houses, a proposed amendment to the Constitution, and, this being done (permissibly concurrently) as the necessary, natural precursor of and predicate for the other process, to wit, that of ordering the election, including a valid provision for the time it shall be held.

[13] Upon this premise it is insisted that the provisions respecting the election confer this power upon the Legislature in its law-making capacity not as an entity, and therefore other provisions of the Constitution governing law-making come into operation and deserve observance in the process of completely ordering the election, including the time for holding it, and, being but an act of law-making, no invalidity would result from delegating to the Governor the discretion to fix the time of the election, a committal of discretion long recognized in the statutes of this state with respect to elections. This practice is invoked in the aid of the view urged for appellee. It is referable to the rule recognizing the force of contemporaneous construction in those cases only where the subject of consideration is open to construction—where the provision is not plain and unambiguous. In the original opinion it was pronounced, on abundant, unquestionable authority, in this court and elsewhere, that contemporaneous construction or practices illustrative of an interpretation otherwise than according to the plain and unambiguous intent of the terms employed in the Constitution cannot be consulted or heeded, to the end that the plain, unambiguous provisions of the organic law might be deflected from their intended and avowed effects.

In addition to these considerations, recourse to contemporaneous construction or governmental practices with respect to elections in this state is utterly impossible here, for the obvious reason that the provisions of article 18, touching the matter of elections on proposed amendments to the Constitution, are new to the present Constitution of 1901, as a comparison of the preceding organic laws of the state readily discloses. Even if the plain intent of this feature of section 284 could be regarded as changed or modified (in effect amended) by the course of governmental agencies in pursuing another method

in the premises, no semblance of such practice appears to exist. Surely a few sporadic offenses against an unambiguous constitutional mandate will not suffice to establish the basis for a subversion of its terms. Indeed, the same Legislature submitting the "road bond amendment" submitted the "increased interest amendment," described in paragraph 6 of the bill filed in this cause, in accordance, in this regard, with the requirements of section 284; that is to say, the Legislature itself fixed the date for the special election on that proposed amendment. Confining the inquiry projected by the arguments for rehearing to the scope and realm to which the language of the Constitution and all juristic considerations that contribute to sound constitutional exposition restrict it, the question's solution cannot find just aid in collateral incidents, practices under differently phrased Constitutions or in the generalizations of great writers or courts that had not before them Alabama's organic law.

Recurring to the particular contention for the divisibility of the function of proposing and of submitting amendments to our Constitution: The analysis proposed in the arguments is a striking illustration of the well-known ability of counsel. More; it is pleasing to contemplate as the performance of lawyers of highest skill. Nevertheless, it is not sound. Viewed as the work of a surgeon, it would separate the heart from the body, leaving the body without the impulse of life. The heart of the simple, complete, separately provided, distinct system for amending the Constitution (Jones v. McDade, supra; Commonwealth v. Griest, 196 Pa. 396, 46 Atl. 505, 50 L. R. A. 568, 572, among others) is that which alone can infuse life into that which is lifeless, viz. a favorable election by the people on the amendment proposed. The body to become thereupon vital is the proposed amendment. The electoral function is not the body, but the heart that vitalizes the body. The argument proceeds in the reverse order of the factors to which it must refer. It unjustifiably exalts the mere order in which these two acts may be performed over the constitutional design and composite effect to which that action can alone relate. The design of article 18 is an entire scheme. To propose an amendment without providing for the election would be as much a folly as providing for an election on an amendment not proposed. The plan established by article 18 is the only, the exclusive, plan for amendment. In the opening sentence of this distinct article it is provided that—

"Amendments may be proposed to this Constitution by the Legislature *in the manner following*. * * * "

The italicized words are definitive and restrictive. They, too, are new to the present Constitution. No other manner than that thereinafter, in article 18 plainly provided, can be employed. The generally approved doctrine of Collier v. Frierson, 24 Ala. 100, concludes to the like effect, saying:

"Every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment."

The manner following concerns both the action to be taken and the body to take it. The action is (a) to formulate a proposed amendment, and, having done this, (b) to order an election thereon, and (c) fix the time it shall be held not less than three months after the final adjournment of that session. By what agency is this action to be taken? Section 284 designates the "Legislature" as the agency for taking the action defined. Obviously for this purpose there is reposed in the Legislature the active principle to exercise a special power. The Constitution devotes to its creation a distinctive place in arrangement. There was a separate committee of the convention of 1901 to frame and report on the "Mode of Amending the Constitution"— a committee different from the committee to consider and report on the legislative, the law-making, department. Now, in designating the agency to formulate and agree upon an amendment the Legislature is named. No one has yet contended that in formulating an amendment the Legislature is exercising its law-making power, elsewhere defined and regulated in the Constitution. It would be wholly irrational to do so. In the same section (284), in the same sentence, the writers of the Constitution used the identical word to designate what agency should order the election and fix the time it should be held, viz. the Legislature. If the Legislature as an entity, not in its law-making capacity, is the only agency that can formulate an amendment, how can it for a moment be thought, much less contended, that "Legislature" was intended to have any different effect or design when the ordering of the election and fixing the time it should be held was the purpose of the makers of the Constitution? If "Legislature" means the entity in one instance, it has the same meaning in the other; for there is not in article 18 of the Constitution or elsewhere therein the slightest intimation, structural or verbal, that a different signification was intended in one instance from that patently intended in the other.

There was no obstacle to the Constitution's designating the entity, the Legislature, as the distinctive actor in ordering an election on a proposed amendment and in fixing the time it should be held. The makers of the Constitution were free to repose and impose this power anywhere. They chose the "Legislature," naming the same agency that was des-

ignated to formulate an amendment; but the insistence is that the "Legislature" in another capacity, viz. that of law-making, was the Constitution's intent, and this insistence has led the proponents of this theory into a contention that to accept it would contradict and defeat express provisions of section 287, as is pointed out in the original opinion ante. Having taken this ground, inescapable logic required them to assert that every provision of the Constitution governing law-making is applicable to the process of ordering an election on a proposed amendment and fixing the time it should be held, and this to the extent of affirming that such legislative action should be presented to the Governor under the mandate of section 125, thereby subjecting the action in question to executive veto or amendment. The unsoundness of their major premise and the proposition they proposed to establish upon it is, to our minds, clearly demonstrated by the limits to which the logic of argumentation thus necessarily carried them; for, if providing for an election on a· formulated, proposed amendment is simply a law, is the product of law-making, the Governor's right to participate in the process, as a limited, yet a very potential, part of the legislative department, is established. Nevertheless, to establish it is to ignore this plain language of section 287:

"No act' or resolution of the Legislature passed in accordance with the provisions of this article, proposing amendments to this Constitution, or calling a convention for the purpose of altering or amending the Constitution of this state, shall be submitted for the approval of the Governor, but shall be valid without his approval."

And votes, orders or resolutions "amending this Constitution" are excepted, in section 125 of the Constitution, from presentation to or action by the Governor.

[14] The Legislature may choose either an "act or resolution" through which to exercise the powers conferred by article 18 of the Constitution. Jones v. McDade, 200 Ala. 230, 233, 75 South. 988. The quoted provisions of section 287 mean what they plainly say, viz. that "no act or resolution" shall be submitted to the Governor's approval. The "act or resolution" in the convention's mind is expressly defined in the sentence, viz. the act or resolution passed in accordance with the provisions of this article, thereupon describing the article's substance and design as follows: "Proposing amendments to this Constitution or calling a convention for the purpose" of altering or amending .the Constitution. "Proposing amendments to this Constitution" comprehends that completed process, viz. the submission to the electorate, at a designated time, of a formulated amendment to the organic law. The intent is. the same in the specific exception written in section 125.

The language of section 287 is the same in respect of proposing amendments as it is in respect of "calling a convention," submitting that issue to the ballot (section 286). Could it be soundly contended that the designation of the date that a proposed convention should assemble is mere law-making, and must, to be valid, be submitted to the approval of the Governor as other legislation is? The quoted terms of section 287, absolute, final, and prohibitory, forbid the submission to the Governor's approval of any "act or resolution" passed in accordance with the provisions of article 18; and, being so prohibited, it is impossible, without denying plain language its obvious effect, to refer the ordering of an election on a proposed amendment, or the fixing of the date it should be held, to the Legislature in its law-making capacity. If that dissevering view was taken, the process for amending the Constitution would be an anomalous hybrid, the executive being armed with the power of veto to hinder, delay, or defeat the ordering of the election and the fixing of a day therefor, if the executive was out of sympathy with the Legislature's will. If the Legislature embodied in one act both the proposed amendment and the provisions for the election, as it may do, then, as' it is quite logically asserted, the executive would be further armed, through the veto power, to hinder, delay, or defeat the entire will of the Legislature, if the Governor did not share the legislative view. These and other readily conceivable anomalies would result from taking liberties with the unmistakable language of sections 284 and 287 of the Constitution.

It is insisted that, because no legislative or other regulations are provided in section 284 to govern or define the Legislature's action in respect of the election on a proposed amendment, it should be concluded that this action was designed to be subject to the Constitution's regulations for the making of laws. The Legislature's action in that regard is simply to fix the time the election shall occur. This it may do by either resolution or act, and a resolution is not a law under our system. Reynolds v. Blue, 47 Ala. 711, 713; 34 Cyc. pp. 1167, 1168. The suggestion that, unless subjected to legislative regulations in the Constitution, a minority of either house might provide for the election, is, we think, chimerical.

It is asserted in brief for appellee that authorities are abundant to the effect that providing for an election on a proposed amendment to a Constitution is but a matter of legislation, subject to constitutional regulations of that function. But two decisions are cited to the point on brief for appellee, viz. Hatch v. Stoneman, 66 Cal. 634, 6 Pac. 734, and Neisel v. Moran (Fla.) 85 South.·346. In the Neisel-Moran Case, supra, the Constitution itself fixed the "next general election of representatives" as the time

for the electorate to vote on a proposed amendment. In 'Alabama's Constitution the Legislature is commanded to fix the time for the election. The Florida case is without any bearing upon the question here. The other decision (Hatch v. Stoneman) was predicated of the particular provision of the California Constitution (article 18, § 1), providing that the Legislature should submit a proposed amendment "in such manner, and at such time, and after such publication as it may be deemed expedient." The court there drew a distinction between the formulation of an amendment and provision for an election thereon, holding the latter action to be law-making only, and that presentation to the Governor was essential. The decision may be sound as an exposition of the Constitution there involved. Its doctrine did not find favor in Commonwealth v. Griest, 196 Pa. 396, 46 Atl. 505, 50 L. R. A. 574, 575. Suffice it to say, as did the court last cited, that the provisions of our Constitution, particularly those quoted from section 287, are materially different from those of California, and that that decision is valueless here.

Pertinent historical events forming the circumstances in the atmosphere of which the constitutional convention of 1901 wrought out the present organic law further emphasize the correctness of the conclusion of this court. On December 16, 1898, Gov. Joseph F. Johnston approved an act to provide for holding a convention to revise and amend the Constitution of this state, Gen. Acts 1898–99, pp. 90–97. For reasons entertained by the Governor, in May, 1899, he called the Legislature into special session to consider the repeal of the act submitting the call for a constitutional convention to the people of Alabama. Upon the assembling of the Legislature in special session, the Governor communicated thereto his official message. It is reproduced in the published acts of that session. It was a forceful presentation of the executive views. The message reflects the public excitement of the time, noting the impending mass meeting for that evening in the city of Montgomery, and that the United States senators and members of Congress representing Alabama were proclaimed as ready to participate in the effort "to instruct" the Assembly as to their duty to refuse to repeal the act calling the convention and submitting that issue to the ballot. The Governor's views prevailed in the Assembly. The act was repealed. Accompanying the Governor's message to the Legislature was a letter to the Governor from Hon. Robert C. Brickell, giving it as his opinion that the Assembly had the rightful power to repeal the act calling a constitutional convention; and, in the course of his letter, he advised that, as to the method of constitutional change by amendment proposed, the doctrine of strict observance of constitution-

al prescriptions, laid down in Collier v. Frierson, 24 Ala. 100, and in Jameson on Constitutional Conventions, § 574e, was essential. The General Assembly next elected, after the retirement of Gov. Johnston, passed the act approved December 11, 1900 (Gen. Acts 1900–01, pp. 224–234), again submitting the call for a constitutional convention to the electorate. The call was sustained. The convention met and wrote the present organic law. The memory and purposes, at least on one side, of the contest and conflict of 1899, found unmistakable expression in the Constitution. In section 286 the power to repeal an act submitting a call for a constitutional convention, after the session adopting the act had adjourned, is expressly inhibited, thus preventing a recurrence of the issue to which Judge Brickell contributed one view and other eminent men took the opposite view. The purpose to curtail the executive power and influence was manifested in the provisions of section 116, assuming to declare a Governor ineligible for election to the Senate of the United States during his term as Governor and for one year after the expiration of his term.

With this mere outline of the events of that day, just preceding the convention which wrote this Constitution, and the manifestation otherwise of the convention's purpose with respect to the officials, the Governors then and yet to come, it is altogether plain that section 287, in the particular quoted, was intended to exclude the Governors from all participation in the process of formulating proposed amendments and of appointing the time for election thereon, and also from all participation in respect of the calling of a convention and the submission of that issue to the ballot, except in the services to be rendered by the Governor after the authority and powers of the Legislature have been fully exercised in the mode prescribed in article 18. As was remarked by counsel on the argument, the official, the Governor, is the only officer or person to whom it is expressly forbidden to submit any act or resolution passed in virtue of the particular, special powers granted by article 18 of the Constitution, governing its amendment or change, and it is in plainest language the instrument so declares. To actually violate this unmistakable intent of the Constitution is a capital offense against its authority. It is not a misdemeanor. That powers of government shall be exercised only by those to whom the organic law allows or commits them is a fundamental principle, which no misguided ardor can obscure or ignore. This is a government of laws, not men. The departments of state are required to confine their actions and functions to their respective spheres. The Constitution neither contemplates nor permits the shirking or shifting of responsibilities or duties between depart-

ments of the state. Would even the careless or irresponsible assert that to ignore or violate the Constitution's commanded separation of the departments of state is a mere misdemeanor against the supreme authority of the organic law? To ignore or violate the present prohibition against executive participation is just as grave a disrespect to Constitution as to refuse obedience to the commands of separation of departments.

Reference is made to the general language to be found in Commonwealth v. Clark, 7 Watts & S. (Pa.) 133. That case involved the application of provisions of the "schedule" to the Constitution of Pennsylvania, serving "uses" that were "temporary and auxiliary," and not the Constitution, itself, as appears from the facts in the report, as well as from the statement of Chief Justice Gibson, on page 133 of the report. The declaration of Judge Gibson is that constitutional provisions relating to the "time or manner of performing an act are * * * merely directory, wherever it is not, said that the act shall be performed at the time or in the manner prescribed, and no other." The conclusion to which this language would be carelessly subscribed is refuted by two potent factors, viz.: One is that the Constitution of Alabama (section 284, particularly) provides that its amendment can be effected "in the manner following," and then defines the exclusive manner and mode therefor (Collier v. Frierson, supra), thus answering the qualification stated by Judge Gibson in the quotation ante; and the other is the positive declaration of this court in Perry Co. v. Railroad, 58 Ala. 556, reproduced in the court's original opinion ante.

To this cause and the important questions it involves full, careful, responsible consideration has been given. The reconsideration has only served to confirm further the conviction entertained by the judges through whom the court has spoken, in declaring the "road bond amendment" ineffectual. The Constitution has been observed; its plain mandate enforced; its authority vindicated. That disappointment attends upon this judgment is, of course, natural. This disappointment will be temporary, if the people of Alabama desire to amend the Constitution according to the general design of the "road bond amendment." Delay in road construction in this state is far better, far less hurtful, than constitutional destruction.

The application for rehearing is overruled.

ANDERSON, C. J., and SAYRE and MILLER, JJ., concur.

SOMERVILLE, GARDNER, and THOMAS, JJ., dissent.

THOMAS, J. (dissenting). It may be well to state that the record in this case was originally and in due course assigned to me. The opinion appearing as my dissent was prepared and read to all the justices, and concurred in by Justices SOMERVILLE and GARDNER. The opinion of the majority was thereafter announced, and the dissenting opinions (in which I concur) by Justices SOMERVILLE and GARDNER followed, before the opinion of the majority as extended on rehearing was announced. This will account for duplication on my part of the resolution or act of the Legislature proposing the amendment, provisions of section 284 of the Constitution, and a restatement of some of the grounds on which the adoption of proposed amendment was challenged.

The purpose of the appeal is to determine the constitutional validity vel non of the road bond issue amendment, article 20, section 1A. Seay's Amendments to the Constitution of Alabama, pp. 13–15; Gen. Acts 1919, pp. 787–791. The bill was filed by A. M. Johnson, Jr., an automobile owner and resident taxpayer, seeking to enjoin and restrain John Craft, F. J. Cramton, J. B. Espy, Lloyd Hooper, O. T. Smith, John A. Rogers, Thomas E. Orr, Andrew G. Patterson, S. R. Batson, Marvin Pearce, Eugene A. Smith, and John A. Callan, individually and as members of the state highway commission and of the highway bond commission, and W. S. Keller, individually and as state highway engineer, from issuing, causing to be issued, selling, or offering for sale certain interest-bearing negotiable state bonds, issued, or proposed to be issued, under and by virtue of said amendment to the Constitution.

The resolution proposing the amendment is in form "an act," approved September 30, 1919. General Acts 1919, p. 787. Whether a proposed amendment to the Constitution be in form as "an act" or a joint resolution is immaterial, since its purpose is plain. Const. § 287; Dodd's Revision and Amendment of State Constitutions, p. 155. The preamble to the proposed amendment recites the necessity for the bond issue to maintain a permanent system of highways, and to secure the appropriation for said purpose by the national government. Section 2 is:

"That the following amendment of the Constitution of Alabama is proposed to be submitted to the qualified electors of the state for their ratification or rejection at an election to be held and called by the Governor after ninety days from the final adjournment of this session of the Legislature of which the amendment is proposed, which amendment is as follows, to wit"—setting it out as "Section 3. Article 20. Section 1A."

In section 4 it is provided that—

"It shall be the duty of the Governor to fix the date of said election and to give notice by proclamation to be published in one newspaper in each county in the state at least seven successive weeks next preceding to said election of the amendment proposed by this act

to be submitted to the qualified electors of the state for this ratification or rejection"

And section 5 requires that at said election the qualified electors shall vote upon said amendment on the official ballot printed, etc., as therein stipulated, and—

"That the officers holding said election shall be the same and shall be appointed in the same manner and by the same officials as provided by the election law of the state for the appointment of officers to hold other general elections in the state and *the election shall be held in all respects in accordance with the law governing general elections and with the constitutional provisions concerning amendment to that instrument."*

The provisions of Section 284 of the Constitution of 1901 applicable to the resolution of the Legislature proposing the amendment are as follows:

"Amendments may be proposed to this Constitution by the Legislature in the manner following: *The proposed amendments shall be read in the house in which they originate on three several days,* and, if upon the *third reading* three-fifths of all the members elected to that house shall vote in favor thereof, the proposed amendments shall be sent to the other house, in which they shall likewise be *read on three several days,* and if upon the *third reading* three-fifths of all the members elected to that house shall vote in favor of the proposed amendments, the Legislature shall order an election by the qualified electors of the state upon such proposed amendments, *to be held either at the general election next succeeding the session of the Legislature at which the amendments are proposed or upon another day appointed by the Legislature, not less than three months after the final adjournment of the session of the Legislature at which the amendments were proposed.* Notice of such election, together with the proposed amendments, shall be given by proclamation of the Governor, *which shall be published in every county in such manner as the Legislature shall direct, for at least eight successive weeks next preceding the day appointed for such election.* On the day so appointed an election shall be held for the vote of the qualified electors of the state upon the proposed amendments. If such election be held on the day of the general election, the officers of such general election shall open a poll for the vote of the qualified electors upon the proposed amendments; *if it be held on a day other than that of a general election,* officers for such election shall be appointed; and *the election shall be held in all things in accordance with the law* governing general elections. * * *"

A preliminary observation may be made of the development of the amendment of state Constitutions, that it has been toward confining legislative action simply to the proposal of amendments; the vote of the people being the final determination as to whether an amendment becomes or fails to become a part of the fundamental law of the state. It is of historical value that the first suggestion for amendment upon proposal of the Legislature (approved by the people) was that prepared by Mr. Jefferson (1776) to the Virginia Constitution, and in 1779 such a proposal was rejected by the people of New Hampshire. Ford's Writings of Jefferson, ii, 20, 30; N. H. Town Papers, ix, 841. The Alabama Constitution of 1819 made provision by which the people should vote directly upon proposed amendments, but to the next succeeding Legislature was left the determination as to whether an amendment specifically approved by the vote of the people should be adopted into the Constitution. Such provisions were contained in the Constitutions of 1865 and 1867, and a construction of such provision was dealt with in Collier, Governor, v. Frierson, 24 Ala. 100, and will be adverted to later in this opinion.

Under the Constitution of 1875 was employed the ballot to enforce voting on amendments; that is to say, the Constitution of 1875 required that proposed amendments be submitted at a general election, and that in order to be adopted such amendment should receive the vote of a majority of all qualified electors of the state who voted for representatives. In submitting a proposal to the people in 1898, the Legislature provided (Laws 1896–97, p. 1202, § 3) that the ballot should have printed on it the words, "For Birmingham Amendment," and that—

"Any elector desiring to vote for said amendment shall leave said words intact upon his ballot, and any elector desiring to vote against said amendment shall evidence his intention to so vote by erasing or striking out said words with pen or pencil. The leaving of said words upon the ballot shall be taken as a favorable vote and the erasure or striking out of said words as aforesaid shall be taken as an adverse vote upon said amendment."

Upon such submission the amendment was proclaimed as having been carried. Challenging this method of its adoption, it was contended that the Constitution made necessary a vote either for or against the amendment, and that the method of submission of the proposed amendment by the Legislature made inaction a vote for the proposal. Our court declared that the voter had no constitutional right to a ballot which would permit him to abstain from voting upon such measure, and that the depositing of the ballot by the voter was itself the affirmative action in favor of the amendment, unless the contrary was indicated thereon as required by the act of submission. May & Thomas Hdw. Co. v. Birmingham, 123 Ala. 306, 26 South. 537. It need not be observed that such method could not be employed under the present Constitution, which specifically requires a different form of ballot. Harris v. Walker, Supt., 199 Ala. 51, 74 South. 40. However,

that decision was in line with other decisions by our court that had adopted a liberal construction of the Constitution and of the act or resolution of submission of a constitutional amendment to the people, as pertaining to amendments proposed and adopted by the required vote of the people, which is the final determination as to whether an amendment becomes or fails to become a part of the state's fundamental law. Dorman v. State, 34 Ala. 216, 235; Covington v. Thompson, 142 Ala. 98, 107, 38 South. 679; Realty Inv. Co. v. City of Mobile, 181 Ala. 184, 187, 61 South. 248; Dent et al. v. City of Eufaula, 199 Ala. 280, 74 South. 369.

In considering the legislative history of Senate Bill (or the resolution) No. 218, it will be noted that it was passed in the respective houses upon the third reading by three-fifths vote of all members elected to that house who voted in favor thereof, and being sent to the other house, in which, it was likewise read on three several days, and upon a third reading therein, three-fifths of all members elected to that house voted in favor of the proposed amendment; that thereafter the same was signed by the respective presiding officers of both houses and sent to the Governor, who returned it to the Legislature with the suggested amendment, incorporated therein as a part of the proposed amendment, on September 27, 1919, the fiftieth and last legislative day. This suggestion by the Governor, appropriated and incorporated by the Legislature as a part of the proposed amendment to the Constitution, was the addition of the words "subject to the approval of the Governor," in the concluding paragraph of subdivision B, making it read:

"And all moneys derived from the sale of said bonds shall be expended as the Highway Department may direct, *subject to the approval of the Governor.*"

The record further shows that, after concurring in and adopting the suggested amendment by a three-fifths vote of all members elected to each house voting in favor thereof, the act proposing the amendment to the Constitution, as amended by the Legislature as aforesaid, was signed by the presiding officer of each house, and approved by the Governor three days after final adjournment of the Legislature, volume 2, Sen. Journal, p. 2528; volume 2, House Journal, p. 2845.

The inquiry first propounded for decision is: Can the Legislature delegate to the Governor the power to designate a particular day upon which the special election is to be held upon the proposed amendments to the Constitution, provided the particular day appointed by the Governor be within the time fixed by the Constitution?

It has been declared generally by the courts that Legislatures cannot delegate their legislative power, but may make laws which delegate to agencies of the government or officers thereof the authority to perform administrative functions which the Legislatures themselves might perform, and may authorize such officers in such administration to exercise "legislative discretion." Ex parte City of Birmingham, 199 Ala. 9, 14, 74 South. 51; McNeill, Supt., v. Sparkman, Treas., 184 Ala. 96, 99, 63 South. 977; Whaley v. State, 168 Ala. 152, 52 South. 941, 30 L. R. A. (N. S.) 499; Railroad Commission v. Ala. North. Ry. Co., 182 Ala. 357, 62 South. 749; Ward v. State, 154 Ala. 227, 45 South. 655; Tallassee Falls Mfg. Co. v. Comm. Court, 158 Ala. 263, 48 South. 354; Arver v. United States (Selective Draft Case) 245 U. S. 366, 389, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856; State ex rel. Smith v. Justice, 200 Ala. 483, 485, 76 South. 425; United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; Field v. Clark, 143 U. S. 649, 694, 12 Sup. Ct. 495, 36 L. Ed. 294; Intermountain Rate Cases, 243 U. S. 476, 37 Sup. Ct. 407, 61 L. Ed. 857; First National Bank v. Union Trust Co., 244 U. S. 416, 37 Sup. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas. 1918D, 1169.

General rules of construction are that provisions of the fundamental law should not be given a narrow or technical construction, defeating or unduly limiting the express and implied purpose for which it was intended by the constitutional convention (State v. Birmingham Sou. Ry. Co., 182 Ala. 475, 491, 492, 62 South. 77, Ann. Cas. 1915D, 436; Hagan v. Comm. Court, 160 Ala. 544, 49 South. 417, 37 L. R. A. [N. S.] 1027; Joseph v. Randolph, 71 Ala. 499, 46 Am. Rep. 347); and that a new constitutional provision adopted by the people already having well-defined institutions and systems of law—

"must not be construed as intending to abolish the former system, except in so far as it is in manifest repugnance to the new Constitution, and, in determining the real scope and meaning of the new provision, it must be read in the light of the former law and the existing system." State v. Birmingham Sou. Ry. Co., supra; Taylor v. Woods, 52 Ala. 474; Bender v. Meyer, 55 Ala. 576.

The observation of Mr. Chief Justice Brickell of the Constitution was that it was "not the origin or beginning of law in the state"; that "it was made by and for the people among whom the common law prevailed, so far as applicable to their condition, and not superseded or repealed by legislation or constitutional provision,—a people having a well-defined, and well-understood system of law, written and unwritten, statute and constitutional"; that it was not

intended to abolish or destroy this system, and set up a new and different system on its ruins; that this system continued, except so far as it is repugnant to the Constitution, subject to the limitations and restrictions imposed by law; that—

"In the light of the former law and existing system, new constitutional provisions are to be read and interpreted, if their real meaning is ascertained, and the intent of the lawgiver carried into effect." Taylor v. Woods, supra, 52 Ala. 477; Ex parte Roundtree, 31 Ala. 42, 44; State ex rel. Winter v. Sayre, 118 Ala. 1, 28, 24 South. 89; State ex rel. Robertson v. McGough, 118 Ala. 159, 166, 24 South. 395; Cooley, Const. Lim. 60.

"New provisions, having their origin in larger experience, introduced into an amended or revised constitution, are to be construed and allowed such operation as will secure the purposes for which they were introduced; and these purposes are to be ascertained from a just consideration of the causes in which they originate." Mayor of Mobile v. Stonewall Ins. Co., 53 Ala. 570, 577; State v. Birmingham Sou. Ry. Co., supra.

That is to say, to regard the nature and objects of its provisions, the end to be accomplished, giving its words their just and legitimate meaning, and to regard "not so much the form or manner of expression" as the foregoing considerations. Carroll v. State, 58 Ala. 396, 401; State v. Birmingham Sou. Ry. Co., supra, 182 Ala. 491, 62 South. 77, Ann. Cas. 1915D, 436.

In Ex parte Selma & Gulf Rd. Co., 45 Ala. 696, 728, 6 Am. Rep. 722, it is declared that the General Assembly has the same right to construe the Constitution of the state that the courts have, and where the question is one in which a liberal construction may be made, the legislative construction will not be condemned unless it clearly appears that it is wrong. Ward v. McDonald, 201 Ala. 237, 243, 77 South. 827. This is the foundation for the rule of contemporaneous construction announced by the Supreme Court of the United States. In Cohen v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, Mr. Chief Justice Marshall said:

"Great weight has always been attached, and very rightly attached, to contemporaneous exposition."

In Bank of the U. S. v. Halstead, 10 Wheat. 51, 62 (6 L. Ed. 264), Mr. Justice Thompson stated that—

"If any doubt existed, whether the act of 1792 vests such power in the courts [to mould their process as to meet whatever changes might take place], or with respect to its constitutionality, the practical construction heretofore given to it, ought to have great weight in determining both questions." Ogden v. Saunders, 12 Wheat. 214, 290, 6 L. Ed. 606.

The rule of contemporaneous construction is announced by our court in State ex rel. Clarke v. Carter, 174 Ala. 266, 279, 56 South. 974, 978, the excerpt from Cooley's Const. Lim. 67, being approved to the effect that—

"Where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the Constitution, or under a Constitution immediately preceding, and by those who had an opportunity to understand the intention of the Constitution, or a provision thereof in question it is not to be denied that a strong presumption exists that the construction rightly interprets the intention."

This court recently said, through Mr. Justice Somerville:

"As we have already stated, the present structure of the state board of health has existed, under public statutes, since 1875, a period of nearly half a century. So far as we are advised, its legality has never been questioned, and two constitutional conventions have met and adopted new, and re-adopted old, constitutional provisions, without undertaking to curb this notorious and extended exercise of legislative power. * * * But the uniform legislative interpretation of doubtful constitutional provisions, running through many years, is of weighty consideration with the courts. Ex parte Hardy, 68 Ala. 303; Moog v. Randolph, 77 Ala. 597, 606; Farrior v. N. E. M. Security Co., 88 Ala. 275, 279, 7 South. 200; Jones v. McDade, 200 Ala. 230, 75 South. 988." Parke et. al. v. Bradley, State Treas., 204 Ala. 455, 459, 86 South. 28, 32.

All of our Constitutions have expressly remitted to the Legislature as an original and inherent power the matter of providing for elections on constitutional amendment. The time and place of holding elections are proper and necessary elements of the inherent power remitted to the Legislature by the Constitution. This is the effect of the announcement by Mr. Chief Justice McClellan in May & Thomas Hdwe. Co. v. Birmingham, 123 Ala. 306, 322, 26 South. 537, 542, where he says:

"The extent of the requirements of the Constitution of Alabama touching the method of voting upon a proposed amendment of that instrument is the provision that all elections by the people shall be by ballot, and the provision for the opening of a poll for the vote of the qualified electors on the proposed amendment. These two provisions together amount simply to a requirement that a proposed amendment shall be submitted to the qualified electors of the state for their vote upon it by ballot. The Constitution expressly remits to the General Assembly the matter of regulating and governing election by laws' which are required to be uniform throughout the state."

The Constitution of 1901 declares this power to be in the Legislature. In section 190 thereof it is provided that—

"The Legislature shall pass laws not inconsistent with this Constitution to regulate and govern elections, and all such laws shall be uni-

form throughout the state; and shall provide by law for the manner of holding elections and ascertaining the result of the same," etc.

See, also, Const. § 222.

This was the power embraced in former Constitutions (Const. 1875, art. 8, § 5), and which Chief Justice McClellan applied to elections on constitutional amendments. Section 156 of the Constitution provides for the election of Justices of the Supreme Court, to be chosen by elections to be held at times and places fixed by law for the election of members of the House of Representatives of the Congress of the United States, "until the Legislature shall by law change the time of holding such election." So, also, does the Constitution declare that the Legislature shall have power to provide for the holding of chancery and circuit courts and of courts having the jurisdiction of such courts, and when the chancellors or judges fail to attend the regular terms of such courts (Const. § 161); yet the power to fix a time for the holding of these courts has been delegated to the Governor or the Chief Justice of this court. This provision of the Constitution is as mandatory upon the Legislature to fix the times of holding courts as it is to the time of holding elections, and it has not been contended successfully that the Legislature has not delegated that power and function to administrative officers.

Thus we are brought to the question: Are the terms of section 284 of the Constitution, providing for the special election "upon any other day appointed by the Legislature" more imperative, or the power there dealt with less delegable, than the other commands of the Constitution, namely, that the Legislature shall fix the time and place of holding the courts, fix the times and places of holding all other elections, or shall fix rates and charges of public highways and common carriers? McNeill v. Sparkman, supra. In Railroad Commission v. A. N. Ry. Co., 182 Ala. 357, 362, 62 South. 749, 750, Mr. Chief Justice Anderson said of the provisions of the Constitution providing the power and authority of regulating railroad freight and passenger tariffs, etc., declared to be "hereby conferred upon the Legislature, whose duty it shall be to pass laws," etc. (Const. § 243):

"Our own court is in accord with the holding that the Legislature performs its function in creating the laws and can delegate the execution of same to officials legally selected for said purpose, and that the giving of said officials some latitude in the execution of same does not amount to the delegation of the authority to legislate." Kimbrell v. L. & N. R. R. Co., 191 Ala. 392, 67 South. 586; Ex parte City of Birmingham, supra.

For long years the Legislature of Alabama has repeatedly delegated to the Governor, sheriffs, county commissioners and other governmental agencies the power to fix and name the exact date on which all elections, general and special, should be held. Even when the Constitution has named a date on which general elections should be held, in every instance (except in the Constitution of 1868—Code 1907, p. 129, § 3, art. 4), it has expressly authorized the Legislature to name these dates and to fix other dates. See all previous Constitutions, same article. As to general elections, the general rule has been that the law named the date; but, as to special elections, the general rule has been that the Governor or other officers or governmental agencies should fix the date. Fixing the time and places for holding elections has always been considered an administrative function, and one which the Legislature could delegate, and the Legislature has so delegated as to special elections during the entire history of the state. See Code, 1907, §§ 440, 441, and corresponding sections of previous Codes there indicated. If the Legislature can delegate the power to the Governor or other officers to fix the date of special elections, it can delegate the power to fix the date of general elections, for there is no difference in kind as to the power to provide for general or for special elections. The Legislature possesses the inherent power as to both. The Legislature has always delegated the power to fix the places at which all elections should be held. There is no difference in the power of the Legislature as to fixing the places of elections and the power of fixing the time of elections. The power of the Legislature in this respect has never been questioned. Therefore the constitutional convention that framed the Constitution of 1901 was cognizant of the law and long-existing precedent in providing for all elections in this state. Hence, when it was provided in the Constitution (1901) that the Legislature should call or order an election by the qualified electors of the state, at which proposed amendments to the Constitution should be voted upon by the people, the convention contemplated that all special elections directed in the Constitution should be provided for by the Legislature in the same manner as the Legislature had always theretofore provided, under all previous Constitutions and for three-quarters of a century, subject to such limitations only as to time or manner which were prescribed in the Constitution.

The Constitution of 1901 provides that the election on proposed amendments to the Constitution shall be held, at the discretion of the Legislature, either at the next general election or at a special election to be held not less than three months after the final adjournment of the session of the Legislature at which the amendments were proposed, and that the time of holding the special election

shall be appointed by the Legislature. By the instant resolution or act the Legislature did appoint an exact date for the holding of the election on the proposed amendment, within the time specified in the Constitution—not less than three months after its final adjournment and before the next succeeding general election. It is true that the act or resolution itself did not name the exact date, but it required the Governor to name the day, within the time specified both by the Constitution and the statute; that is to say, it delegated to the Governor the administrative power to fix the exact date of the special election in consonance with authority of law obtaining in this state for nearly a century. Payne on Elections, § 301. And it became the Governor's duty, as a governmental agency, to act in that behalf within the time indicated by the Legislature—that intervening beyond three months from the adjournment of the Legislature and the general election next succeeding the session of the Legislature proposing the amendment. In this connection, we observe, it could not be said that the makers of the Constitution were distrustful of the Governor of the state in the performance of the duties committed to him in so far as an election on proposed amendments to the Constitution is concerned, for the Constitution itself expressly commits to the Governor responsible administrative duties in this behalf. Const. § 120. Such constitutional power is self-executing and mandatory. If the Governor could not be compelled to name the date on which the election should be held, as prescribed by the act and required of him as a governmental agency, he could not be compelled to issue his proclamation and give notice required by the Constitution, or could not be compelled to make proclamation of result of the election as therein provided. In the instant act or joint resolution the Legislature did exactly what all other Legislatures had always done when required to appoint or fix exact dates of special elections—made the date or time of holding the election of certain ascertainment to all of the people of the state, that those exercising the franchise might appear at the time and place fixed by the administrative, governmental agency, to express a choice at the polls on the proposed amendment.

The reason for the practice of the Legislature delegating to some other officer or agent of the state the power to fix the exact dates of special elections is well founded. The Legislature can act only when it is in session. It is impracticable, if not well-nigh impossible, during the session of the Legislature, for it to know the most appropriate time for holding a special election. This is true when the Constitution provides (as it does) that such election must be held on a day not less than three months after the final adjournment of the Legislature, and the Legislature cannot know, in advance of the conduct of the public business or necessities, when it will finally adjourn. It might be necessary for the general welfare that it recess from time to time, or for any reasonable length of time, as is usually the course of legislative deliberations. If the act or resolution proposing the constitutional amendment should be passed at the beginning of the session of the Legislature, and the exact date of holding of the election be fixed therein, the Legislature might not be able to finally adjourn within three months before the date so fixed. It is therefore proper, and sometimes necessary, for the Legislature to delegate this administrative authority to fix the date of the special election to some officer or agency of government, who, after the Legislature has finally adjourned and within constitutional limitations, can fix the date of the special election. True, it has been said by the court that acquiescence will not prevent a court from declaring void a statute which clearly contravenes a Constitution; but uniform interpretation by the Legislature of doubtful provisions of Constitutions, which has continued for three-quarters of a century, is of weighty consideration in all courts. Where a Legislature has delegated certain powers for many years (as that of calling special elections to the Governor), and that delegation has never been disputed or denied, and a new Constitution is adopted (in the light of such practices and statutes), which Constitution does not expressly prohibit such delegation of power, it is a very cogent reason to believe that the power is and was intended to be delegable.

To state the question concretely: When the Constitution of 1901 was adopted, containing the new provision for a special election (section 284), it had long been the law that special elections were to be held in such "cases as are or may be provided for by law" (Code 1907, § 439; Code 1896, § 1598 [359] [249]), and it was provided by law that "all special elections shall be held on such day as the Governor may direct" (Code, § 440; Code 1896, § 1599 [360] [250]), and that "all special elections provided for by this article [article 19, Code 1907; article 6, Code 1896] are to be ordered by the Governor, who * * * must specify * * * the day on which, such election is to be held; the cause and object of the same," etc. Code 1907, § 441; Code 1896, § 1600 (361) (266) (233). When section 284 of the Constitution was adopted, it provided by law for a special election which had not theretofore existed (article 17, § 1, Const. 1875), and such new provision of the Constitution became a "case" provided for by law, to which sections 1598–1600 of the Code of 1896 (Code 1907, §§ 439–441) were applicable. Such was the rule of uniform interpretation touching the administrative power of the Governor as it was delegated to

him by the Legislature in the instant case. This new provision in section 284 of the Constitution, providing for a special election, an ancient, well-defined, administrative function or power delegated to the Governor, must not be construed as intending to abolish the former system, as so governed by statute; the real scope and meaning of the new provision providing for special election must be ascertained by reading it "in the light of the former law and the existing system," giving the Governor the power to name the date of the special election, which the Governor did with authority of law in the instant case.

We do not mean to say that it is necessary to resort to the rule of contemporaneous construction of constitutional provisions, to uphold or support the conclusion that the Legislature may delegate the power to fix the time and places at which elections shall be held. This, for the reason that the power to provide for elections is an original and inherent power in the Legislature; and the present Constitution has not only not taken away this inherent power, but recognized it in declaring that the "two houses shall have all power necessary for the legislation of a free state." Const. § 53.

The inherent power of the Legislature was dealt with in Miller v. Marx, 55 Ala. 322, 331, 332, having for construction the homestead provision of the Constitution of 1875 (article 10, § 2), which provided that "every homestead, not exceeding eighty acres, * * * shall be exempted," etc. To effectuate the will of the Constitution-makers in protection or security of a personal right of the citizen, Judge Stone, writing for the court, held that the power to award or allot homestead exemptions was an inherent legislative power, except as the power was limited by the Constitution, and that the constitutional provision in question was self-acting and not in form a direction to the Legislature, and that it exempted homesteads—a personal right of the citizen—to the amount of 80 acres, and therefore limited the minimum of the exemption, but that it did not impose any restrictions on the power of the Legislature to increase the amount to which the resident might be entitled; and this, although the words "not exceeding eighty acres," when read by themselves, could manifestly have no other meaning. See, also, Kenneweg v. Allegany County, 102 Md. 119, 123, 62 Atl. 249; Winston v. Moore, 244 Pa. 447, 91 Atl. 520, L. R. A. 1915A, 1190, Ann. Cas. 1915C, 498.

That a legislative act or resolution cannot be declared void unless an express prohibition can be found in the Constitution, and that implied prohibition will not suffice, was settled in Southern Railway Co. v. St. Clair, 124 Ala. 491, 494, 27 South. 23. If there had been doubt of the right to strike down a statute by implied prohibition, it was resolved by this authority. The court said:

"* * * In the absence of express, affirmative provision, from the mere silence of the Constitution in reference to any subject, prohibition of legislative power cannot be implied. When the Constitution is silent, the power to legislate exists, or there must be departure from the established principle 'that Constitutions are not in the nature of enabling acts, but are limitations upon the otherwise boundless powers of the Legislature, or, in other words, that the General Assembly is not to look to the organic law to ascertain what is permitted it to do, but only to find what inhibitions are thereby put on its action.' Mayor v. Klein, 89 Ala. 465; Sharpless v. Mayor, 21 Pa. St. 147 (s. c. 59 Am. Dec. 759); Commonwealth v. Maxwell, 27 Pa. St. 446. In Prouty v. Stover, 11 Kan. 256, defining the nature and extent of implications, which are indulged to avoid legislation, Judge Brewer said: 'To sustain an implied inhibition, there must be some express, affirmative provision. The mere silence of the Constitution on any subject cannot be turned into a prohibition.' * * * 'To sustain an implied inhibition, the express provision must apply to the exact subject-matter, and the inhibition will not be extended further than is necessary to give full force to that provision.' * * * 'To declare a law void as conflicting with an express provision of the Constitution, the conflict must be clear. So say all the authorities.'"

If there is no express provision in the Constitution against the delegation of the administrative duty to the Governor to fix the day of the election, within the constitutional limits, that negation does not exist; if there is no express provision in the Constitution that denies the right of the Legislature to adopt the amendment suggested by the Governor, it does not exist; if, there is no express provision in the Constitution against the incorporation in the act or resolution of the matter embraced in its section 7 requiring reports of the state highway engineer to the state treasurer as therein required, and pertaining to the duties of the state treasurer, etc., then it does not exist. It would appear that the St. Clair Case answers appellant's attack on the act or resolution on grounds of failure of adoption pursuant to the Constitution.

Appellees rely on Collier, Governor v. Frierson, supra. The constitutional provision there construed was contained in the Constitution of 1819. The amendment to that Constitution, submitted to the vote of the people by the General Assembly of 1844–45 (Acts 1844–45, p. 208), proposing biennial (instead of annual) elections of the state treasurer and comptroller, held not ratified because omitted from the ratifying resolutions of the next succeeding Legislature, and did not even show that that particular amendment was voted upon, eight amendments being proposed at the same election. Mr. Justice Goldthwaite stated that there were two ways by which that Constitution could be amended,

either by the people, who originally framed it, or in the mode prescribed by the instrument itself, and, if the last mode is pursued, the amendments must be proposed by two-thirds of each house of the General Assembly, must be published in print as required, and it must appear (from the returns made to the secretary of state) that a majority of all the citizens of this state voting for representatives have voted in favor of the proposed amendments, and two-thirds of each house of the next General Assembly shall, after such election and before another, ratify the same amendments by yeas and nays; the proposed amendments shall, at each of said sessions, have been read three times, on three several days, in each house. Under such provision for double ratification (1) by the people and (2) by the next succeeding session of the Legislature, the Justice says, of the failure of the record to show such subsequent ratification by the second Legislature, that every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. This amendment to the Constitution made the subject of consideration in Collier v. Frierson, supra, was considered by Mr. Justice Brewer in the Constitutional Prohibitory Amendment Cases, 24 Kan. 700, 709, 710, as follows:

"It is well said by counsel that no change can be made in the fundamental law, except in the manner prescribed by that law. In the case of Collier v. Frierson, 24 Ala. 100, the court says: 'We entertain no doubt that, to change the Constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment.' That case illustrates and enforces this proposition. The Constitution of Alabama required, in order to work an amendment, that the proposition be approved by two-thirds of one Legislature, a popular vote, and then by two-thirds of the next Legislature. This last approval was wanting, and the court held that the Constitution had not been amended. In other words, proceedings under a Constitution to change that Constitution must be in accord with the manner prescribed by that Constitution. But this only brings us to the real question in this case: Is a proposition to amend the Constitution in the nature of a criminal proceeding, in which the opponents of change stand as defendants in a criminal action, entitled to avail themselves of any technical error, or mere verbal mistake; or is it rather a civil proceeding, in which those omissions and errors which work no wrong to substantial rights are to be disregarded? Unhesitatingly, we affirm the latter. The central idea of Kansas law, as of Kansas history, is that substance of right is grander and more potent than methods and forms. The two important, vital elements in any constitutional amendment are the assent of two-thirds of the Legislature and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms."

The Legislature proposed the amendment, the Governor, as its administrative agent, gave notice as required by the Constitution and fixed the date of the election as provided by law, and at the election, held as provided by law, the amendment was ratified by a large majority of those voting, being therefor 83,607, and against 12,026. By this was accomplished the constitutional essentials—the assent of both Houses of the Legislature in proposing the amendment, and its adoption by a majority of the popular vote after due notice. Such are the cogent reasons which will prevent defeat of the will of the Legislature and the will of the people, on the ground "that the election on said amendment was not ordered and the day of the election fixed by the Legislature as required by the Constitution."

Resolutions or acts proposing amendments to the Constitution, passed by the constitutional majorities of both houses in manner provided by the Constitution, are valid as against the Governor's veto. The provision in section 287 of the Constitution, that no act or resolution proposing an amendment to the Constitution shall be submitted for the approval of the Governor, etc., is merely a declaration that the Governor's approval shall not be necessary. Dodd's Revision and Amendment of State Constitutions, pp. 148, 152. The submission to the Governor of such acts or resolutions was not required before the Constitution of 1901; the provision that such act or resolution shall be valid without the Governor's approval is but declaratory of what the several Constitutions had theretofore intended on this subject. If an act or resolution proposing an amendment is valid without the approval of the Governor, it is not rendered invalid by its submission to him and his approval three days after the adjournment of the Legislature.

Where the resolution or act is submitted to the Governor for approval, and an amendment is proposed by him which is adopted by a three-fifths vote of the members elected to each of the respective houses, etc., and as amended is approved by the Governor, the act or resolution is not rendered void because of the adoption of such suggestion or amendment; that is, because, after the passage of the resolution, suggestion is made that the act or resolution be amended by the inclusion of the phrase "subject to the approval of the Governor" after the words "and all moneys derived from the sale of said bonds shall be expended as the highway department may direct," which was adopted by a three-fifths vote. The Constitution did not require its rereading in both houses of the Legislature on three several days and its readoption upon the third reading. Section 53 of the Constitution provides that—

"Each house shall have power to determine the rules of its proceedings * * * and the

two houses shall have all the powers necessary for the Legislature of a free state."

Thus was the unrestricted right of the Legislature secured, untrammeled by the rules or procedure in other deliberative bodies, otherwise than imposed upon it by its own will.

Having reserved to the Legislature this inherent power, it had the right of amendment or reconsideration as an attribute of such deliberative body, not forbidden to the Legislature by the Constitution, provided the amendment was adopted by the requisite vote of the two houses as required by the Constitution. Crawford, Secretary of State, v. Gilchrist, Governor, 64 Fla. 41, 59 South. 963, Ann. Cas. 1914B, 916. This power is further shown by the provisions of section 286 of the Constitution that—

"No act or resolution of the Legislature, calling a convention for the purpose of altering or amending the Constitution of this state, shall be repealed except upon the vote of a majority of all the members elected to each house at the same session at which such act or resolution was passed."

This Constitution recognizes that the right was inherent in the Legislature to act according to its legislative will as to amending the act or joint resolution (within the limitations prescribed by the Constitution) at the session at which the act or resolution is proposed or passed. The record shows that the amendment in question was incorporated as a part of the act or resolution by the affirmative vote of three-fifths of all the members of both houses, etc., and that the same was signed by the presiding officers of said houses, as required by the rules governing such legislative bodies and by the Constitution itself. As we have stated, the Constitution in section 53 provides that each house shall have power to determine the rules of its proceedings, and that it had the power to amend the act or resolution as it did was settled in Jones v. McDade, 200 Ala. 230, 234, 75 South. 988, 992, where it is said:

"The requirement of three readings in each house of proposed amendments to the Constitution (section 284) was not intended to exact these six readings of a proposed amendment in hæc verba in both houses. To so affirm would exclude the right of the houses to amend, and thereby to perfect proposals for the submission to the electorate of amendments to the Constitution. * * * Any other interpretation would result in the necessity of commencing anew a whole series of readings every time an amendment was desired by either of the houses."

Grounds of the demurrer are that the amendment was not advertised as required by law. Const. § 284; Gen. Acts 1915, p. 602. In Jones v. McDade, supra, 200 Ala. 237, 75 South. 995, this court said of a provision of section 284 of the Constitution, that—

"It is strange that in the preparation of this feature of the official ballot the legislative directions given in this instance with respect to what the official ballot should contain (Gen. Acts 1915, p. 213) seems to have been at least incautiously ignored. Of course, if the ballot matter recited in an act was deficient, and that placed on the ballots met the exactions of the Constitution (section 285), and the requisite majority approved the proposal, the amendment of the Constitution would be effected, notwithstanding the deficiency of the act's recital in that particular. * * *"

The Constitution required notice by publication for at least eight successive weeks next preceding the day appointed for such election. As to this requirement, it was self-executing to the extent of eight weeks' publication required of the notice of the election, together with the proposed amendment. The Governor's notice and proclamation having conformed to such provision of the Constitution, the stipulation in section 4 of the act for the publication of said election for at "least seven successive weeks" was without effect, though the requirement by publication in a newspaper, etc., was effective. The resolution or act need not have contained any reference to the length of time during which notice and proclamation should be published in the county newspapers, for the reason that the Constitution had imposed the duty on the Governor of giving the lawful notice in manner prescribed. This was done by the Governor in strict conformity to the Constitution.

The proposed amendment is not void for uncertainty. Typographical and clerical errors occur in the amendment, authorizing levies of taxes on automobiles, etc. The word "on" is used for the word "and" in paragraph B of section 3, after the words "levied and collected," and before the words "all such vehicle privilege license tax." The context shows that the conjunction was intended and supplied, or the context was self-corrective. In paragraph G of section 3 the time when the same became effective is supplied by the context and a change in the punctuation. This is permissible to effectuate the legislative intent apparent from the context and whole instrument; when so considered the meaning is "that this amendment and the foregoing provisions thereof when ratified by the people are self-executing without the aid of further legislation, but the Legislature shall pass such laws as it may deem necessary to secure the full benefit and effect of this amendment to the Constitution. (,) Either (either) at this session of the Legislature or at the earliest possible time after the ratification by the people (.)" That this amendment shall become in full force and effect, notwithstanding sections 93 and 213 of the Constitution concerning conflicting provisions. Hooper v. Birchfield, 115 Ala. 226, 232, 22 South. 68; Harper v. State, 109 Ala. 28,

31, 19 South. 857; State ex rel. Leslie v. Bracken, 154 Ala. 151, 155, 45 South. 841; State ex rel. Wilkinson et al. v. Lane, 181 Ala. 646, 655, 62 South. 31, and authorities collected in Williams, Judge, v. State ex rel. Schwarz, 197 Ala. 40, 48, 55, 73 South. 330, Ann. Cas. 1918D, 869; Clark v. Boyce, 20 Ariz. 544, 185 Pac. 140; Cooley, Const. Lim. (7th Ed.) p. 91; 2 Lewis' Sutherland Stat. Const. § 380.

We think the trial court properly sustained demurrer to complainant's bill and dismissed the same, and that decree should be affirmed.

SOMERVILLE and GARDNER,i JJ., concur'in the foregoing dissenting opinion of THOMAS, J.

SOMERVILLE, J. (dissenting). I concur in the foregoing opinion of Mr. Justice THOMAS, which presents an admirable exposition of the constitutional provisions here in question, and a full review of the principles and authorities upon which the conclusion of the minority is grounded. I wish now to state a few observations of my own, which are suggested by my examination of the opinion filed in support of the majority view, and by my further consideration of the constitutional provisions which my Brethren of the majority have held as inconsistent with the validity of the Road Bond Amendment.

The Justices of the minority are in entire accord with the sentiment—so vigorously stated and so well sustained in the opinion of Mr. Justice McCLELLAN—that the Constitution is the paramount law, to which each department of the government, legislative, executive, and judicial, must yield an unquestioning obedience; and we are profoundly sensible of our solemn obligation, as members of this high court—its appointed interpreter and guardian—to preserve its integrity and to see that its authority and mandates shall never be denied or disregarded.

The question at issue is not whether a recognized mandate of the Constitution can be disregarded—as to which there can be no difference of opinion—but whether there is in fact to be found in section 284 of the Constitution a mandate which has been disregarded or disobeyed. Independent of the Constitution, the Legislature possessed the power to provide for and regulate elections, and section 190 of our present Constitution imposes upon it the duty of enacting laws for. that purpose. Section 284 requires the Legislature to order an election upon proposed amendments "[which is] to be held either at the general election next succeeding the session of the Legislature at which the amendments are proposed *or upon another day appointed by the Legislature."*

It seems quite clear to me that in making this provision for holding an election, which is indeed mandatory, the Constitution makers assumed as a matter of course that the Legislature would appoint a day, and that the italicized phrase is no more than a reference to the anticipated exercise of legislative authority in that behalf. I cannot discover in such allusion to anticipated legislative action any purpose to impose upon the Legislature a direct mandatory duty to provide for the time of the election, and to exclude the Legislature from acting in the usual way in accordance with its immemorial practice by general provision or by a delegation of this unimportant ministerial duty to another responsible governmental agency. I cannot agree with the statement in the majority opinion that the mere appointment of a day for such an election was in fact, or was so regarded by the Constitution makers as, "a purpose of the gravest constitutional character"; nor can I discover any intention on the part of the Constitution makers to descend to a statement of administrative detail in such a matter, and thereby to change a mode of procedure which was familiar to the Legislature and to them, and the necessity or utility of which is by no means apparent.

I may concede that the interpretation which the majority have placed upon this provision is a permissible interpretation, but that such a meaning is necessarily to be deduced from such language, or that such is its most rational meaning, I cannot concede. In such a case I think it is the duty of this court to adopt that interpretation of this constitutional provision which is in consonance with the legislative practice theretofore existing, and which will uphold the validity of a constitutional amendment depending upon that action.

The learned writer of the majority opinion himself has furnished an excellent example of common sense construction in denial of the plain letter of the Constitution in the case of Jones v. McDade, 200 Ala. 230, 75 South, 988, in dealing with the requirement of this same section of the Constitution that "proposed amendments shall be read in the house in which they originate on three several days." It was held, upon good and sufficient reason, I think, that a proposed constitutional amendment could be amended at any stage during its passage, and that the completed proposal was not subject to the requirements stated, but could be adopted as amended without a repetition of former readings. The result, as I read the opinion, was grounded solely upon the argumentum ab inconvenienti, and the unreasonableness of such a procedure; and yet the Constitution is explicit in its requirement that the proposed amendment should be read three times on three several days in each house,

and if that provision is to be strictly and literally construed, according to its plain language, there could be no escape from the conclusion that every complete amendment, as it is submitted for adoption by the people, must have been thus read before both houses in its entirety. In the case of Realty Investment Co. v. City of Mobile, 181 Ala. 184, 61 South. 248, it was held by this court that in matters of legislative detail it was sufficient if the constitutional requirement was met "in substance and legal effect"— thus recognizing a distinction in the principles of construction which are to govern in such cases. In that case a literal construction of the requirements of the Constitution as to the form of ballots would have defeated a bond election, and it was observed by Mr. Justice Sayre, speaking for the court, that—

"Constitutions usually deal with larger topics and are couched in broader phrase than legislative acts; hence their * * * interpretation is not always reached by the application of similar methods."

So, in the case of State v. Birmingham Southern Ry. Co., 182 Ala. 475, 62 South. 77, Ann. Cas. 1915D, 436, a distinction was noted between the construction of constitutional provisions dealing with elementary rights of citizens and those which merely prescribe some rule of governmental policy, or relate merely to the conduct and administration of public affairs. And it was there observed that—

"The safe rule of constitutional construction is to regard not so much the form or manner of expression as the nature and objects of its provisions, and the end to be accomplished, giving its words their just and legitimate meaning," and, further, "in determining the real scope and meaning of the new provision, it must be read in the light of the former law and the existing system."

Under section 243 of the Constitution a mandate is laid upon the Legislature "to pass laws from time to time regulating freight and passenger tariffs." And notwithstanding that this duty is imposed directly upon the Legislature, this court held, in Railroad Commission v. Alabama Northern R. R., 182 Ala. 357, 62 South. 749, that this provision meant no more than to require the Legislature to make provision for that purpose, and that the determination and prescription of tariffs for freight and passenger service could be lawfully delegated to a commission created by the Legislature for that purpose; and it must be noted that that commission was not merely empowered to execute the laws, but was invested with a vast discretion in the fixing of tariffs and rates. A literal interpretation of that provision would undoubtedly have confined the Legislature to its own immediate action, and forbidden a delegation of a large and important discretion to administrative agents. But it was observed by Mr. Chief Justice Anderson, speaking for the court, that the object of the constitutional provision was to give proper protection to the traveling public, and that when it passed laws for this purpose its duty was fully done.

The foregoing considerations and analogies will sufficiently explain the basis for the views entertained by the minority justices in this case. It is unnecessary to enter upon a discussion of those authorities which support the view that unimportant constitutional prescription may be regarded as directory rather than mandatory, and their violation disregarded. We wish, however, to note with respect to the case of Oakland Paving Co. v. Hilton, 69 Cal. 479, 11 Pac. 3, which is cited in the majority opinion as an authority repudiating the principles announced by Judge Brewer in the Kansas case, is not in fact an authority to that end, since, as explained in the later case of Oakland Paving Co. v. Tompkins, 72 Cal. 5, 12 Pac. 801, 1 Am. St. Rep. 17, the views quoted represented the individual opinion of Justice Temple, in which the court did not concur. In the latter case it was said:

"All admit that the constitutional requirement must be strictly performed. But it does not follow from this that the language of the instrument must be understood literally. The same rules of construction must be applied, to ascertain what its requirements are, as though they were not mandatory and prohibitory. And we think, when an act commanded or authorized may be done in different ways, either of which would be a strict compliance with the terms of the instrument understood in some common and popular sense, either mode may be pursued, unless some reason is discoverable for holding one of such modes only will answer."

To summarize: We are of the opinion that the language of section 284 of the Constitution may be reasonably construed as a mere reference to expected and appropriate legislative action, appointing a time for holding the election, either by direct action or by a delegation of the duty to a trusted administrative agent according to previous usage, and that it is not only unnecessary, but it is in fact unreasonable to impute to the makers of the Constitution a design to control and limit the action of the Legislature with respect to a comparatively unimportant matter of administrative detail in derogation of a usage which was of long standing, and as to which no necessity for change was apparent.

Upon the soundest principles of interpretation and construction we think that the amendment in question can be sustained. The majority have based their conclusion

solely upon the ground herein discussed, and we therefore deem it unnecessary to enter upon a discussion of other objections which do not seem to be material to that conclusion.

GARDNER and THOMAS, JJ., concur in the foregoing views.

GARDNER, J. (dissenting). The views of the minority have been very ably presented in the opinion of Justices SOMERVILLE and THOMAS, in which I fully concur, and while an additional opinion might appear superfluous, I have thought it not inappropriate, in view of the importance of the question presented as a precedent for the future, and the serious consequences following the decision, to state very briefly some few observations of my own which have been made more clear by the exhaustive brief of counsel for appellee upon application for rehearing, and make reference to a point first presented upon this application, and not heretofore treated.

I am persuaded that section 284 of the Constitution contemplates two separate acts, the first a proposal of an amendment, and, second, after the adoption of the proposal, necessary provision for submission thereof to the people, and that the very language discloses it was not contemplated the Legislature should order an election until after the proposal to amend the Constitution had been passed by both houses. Let it be assumed that the Legislature passed the proposed amendment by the requisite majority, and after a compliance with the provisions of section 284, but that such amendment made no reference whatever to the question of election, which would, of course, have been entirely proper. Section 284 contains no provision as to how the Legislature shall subsequently order an election, nor does it prescribe any method for the passage of such act, nor does section 287 make any reference thereto. If, therefore, the same Legislature proposing the amendment in the foregoing illustration, should by a separate bill provide for a special election, the procedure for the passage would not be governed by any provision of section 284 of the Constitution, but by other provisions concerning ordinary laws. This should suffice to demonstrate that as to this feature of the amendment the Legislature was acting only in its legislative, a law-making, capacity.

Counsel draw the distinction—perfectly valid to my mind—that the authority to propose an amendment is vested in the Legislature as an entity other than a law-making body, while the authority to order an election and provide for the machinery thereof is vested in the Legislature as a law-making body. If this is a correct premise, then it follows, under the authorities, that the Legislature, acting in its legislative capacity,

was authorized to delegate to the Governor the right and power of fixing the day of the election. The recent case of Ex parte City of Birmingham, 199 Ala. 9, 74 South. 51, is sufficient authority upon this point, if, indeed, citation of authority is deemed necessary. I am therefore of the opinion that, even under the strict rule of construction applied by the majority, the amendment is entirely valid.

However, I am not in accord with the rule of construction given application by the majority, for, in my opinion, that part of section 284 dealing with the question of an election should be given a liberal, rather than a strict and literal, construction. It is readily seen that such a rule plays an important part in the result attained. The strict rule of construction applied by the court in the instant case is entirely proper when there is under consideration language of the Constitution dealing with fundamental principles of government, or the life, liberty, or property rights of the citizens, or other matters of substantial character; but to those provisions directed to the law-making body concerning the time or manner of performing certain acts a liberal rule of construction should be applied, and such directions held as merely directory, unless the language used is such as to negative such a construction. This rule was announced in the early judicial history of our country by Chief Justice Gibson in Commonwealth v. Clarke, 7 Watts & S. (Pa.) 127, where, in construing constitutional provisions as to appointments and elections, he said that "necessarily, the paramount rule of interpretation demands that such provisions be deemed only directory." Continuing, the learned jurist said:

"A Constitution is not to receive a technical construction, like a common-law instrument or a statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them; and to that end its commands as to the time or manner of performing an act are to be considered as merely directory, wherever it is not said that the act shall be performed at the time or in the manner prescribed, and no other. The object of the command, in this instance, was no more than to urge the Legislature to put the elective principle in active operation at the earliest day practicable under all the circumstances, and it has been accomplished."

This court, as I read the opinion, practically adopted this rule of construction as applicable to such matters found in the Constitution in the case of Realty Investment Co. v. City of Mobile, 181 Ala. 184, 61 South. 248, where, quoting from Dorman v. State, 34 Ala. 216, the court says:

"A constitution is not to receive a technical construction, like a common-law instrument, or statute."

The majority quote from Collier v. Frierson, 24 Ala. 100, in support of the position

taken, but the language there should be considered in connection with the case then under review. The Constitution then required amendments to be proposed by one Legislature, and accepted by a majority vote of the people and then ratified by the succeeding Legislature. While the amendment there under consideration was proposed by one Legislature, it was not made to appear that it had been ratified by the people, nor submitted to the succeeding Legislature for ratification, and it was in the light of this situation that Justice Goldthwaite used the language quoted in the majority opinion. The language used was entirely applicable to the situation thus presented, and it would appear that the claim that the amendment there considered had become a part of the Constitution was without color of right. The holding in that case was entirely proper, and, indeed, could not have been otherwise, and I do not consider that the language used at all conflicts with the rule of interpretation laid down by Chief Justice Gibson concerning those matters purely of an administrative character, and recognized by this court in the Realty Investment Co. Case, supra.

This court has many times declared that it is a solemn thing to strike down a legislative act as contravening the fundamental law, and that, before this is done, the judicial mind must be convinced to that end beyond all reasonable doubt. But to strike down an amendment to the Constitution, submitted to and ratified by the people, is still more solemn, and, if possible, should call for a higher degree of caution and thorough conviction of the judicial mind.

In section 2 of the Constitution the inherent right of the people to change their form of government (and an amendment to the Constitution is such a change to that extent) was declared in the following language:

"That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient."

It is conceded, and of course correctly so, that whether or not an amendment to the Constitution has been constitutionally proposed and adopted as a part of that instrument is a judicial question, and therefore properly for the courts to determine; but the argument is advanced that, notwithstanding this there does come a time when the courts may decline to consider whether or not a given amendment to the Constitution was in its inception strictly and literally proposed or adopted, as provided in the Constitution, and that such a time arrives when the state as a government, and the people as a body politic, have functioned, accepted and operated under such amendment as a

205 ALA.—27

part of the Constitution. I am persuaded that this is a sound rule.

We have had several amendments to the present Constitution, which have been recognized as a part of the organic law by all departments of the government, accepted as such by the people, and the state as a government has functioned and operated under such amendments as a part of the Constitution for such a time that surely this court would not now attempt a consideration of the question as to whether or not they had been proposed and adopted in the very literal and strict manner provided by the Constitution. This question was given consideration in the case of Secombe v. Kittelson, 29 Minn. 555, 12 N. W. 519, in a suit to enjoin the treasurer from paying out the funds of the state upon bonds authorized to be issued by the constitutional amendment, upon the theory that the proposed amendment was not properly proposed or submitted to the people in accordance with the provisions of the Constitution. Speaking to this question the court said:

"This constitutional amendment, proposed and submitted by the Legislature, was adopted by the people as a part of the fundamental law of the state, and subsequently recognized and acted upon as such by every department of the state government. As ultimate sovereignty is in the people, from whom all legitimate civil authority springs, and inasmuch as in the inception of all political organizations it is this original and supreme will of the people which organizes civil government, a court has no right to inquire too technically into any mere irregularities in the manner of proposing and submitting to the people that which they have solemnly adopted, and subsequently recognized and acted upon, as part of the fundamental law of the state. We doubt whether a precedent can be found in the books for the right of a court to declare void a Constitution, or amendment to a Constitution, upon any such ground. But, however this may be, there are, in our opinion, two conclusive reasons why the right to inquire into any irregularities in the mode and means by which this constitutional amendment was proposed and adopted must be now forever closed: First. Such irregularities, if any, must be regarded as healed by the subsequent act of Congress admitting Minnesota into the Union. Cooley on Const. Lim. 27. Second. They must be deemed cured by the recognition and ratification of this amendment, as a part of the Constitution, by the state after its admission into the Union. This was done by the issue of the state railroad bonds, and accepting security for the protection of the state under its provisions."

The principle was also recognized in Miller v. Johnson, 92 Ky. 589, 18 S. W. 522, 15 L. R. A. 524; Taylor's Case, 101 Va. 829, 44 S. E. 754; Brittle v. People, 2 Neb. 198. I am persuaded that this principle is applicable to this amendment.

The amendment was proposed by a unanimous vote of both houses of the Legislature,

where the Constitution only requires the three-fifths vote of the members elected to each house. It was ratified and adopted by more than seven-eighths of the qualified electors who voted at election—while the Constitution only requires a majority vote for its adoption. It was proclaimed by the Governor to have been adopted as the Constitution required him to do. The Constitution expressly provides that—

"If it shall thereupon appear that a majority of the qualified electors who voted at such election upon the proposed amendments voted in favor of the same, 'such amendment shall be valid to all intents and purposes as parts of the Constitution." Section 284.

The people not only voted for it, but accepted it and acted upon it. The state, acting through its Legislature, accepted it—declared it had been adopted as a part of the Constitution by a solemn resolution and act which proposed an amendment to it, which was subsequently submitted to the people. The state again accepted it by creating a highway commission, which it authorized to issue and sell bonds in accordance with the amendment. This commission has issued and sold some of the bonds, so the bill avers and the demurrer confesses. It authorizes the levy and collection for the exclusive benefit of the road fund and to pay the bonds, the interest thereon, and certain license and privilege taxes. These taxes have been levied and collected, and the proceeds devoted to the purposes specified.

It is common knowledge that the amendment was made in order for the state to accept and to be able to comply with, and get the full benefit of, the offer made by Congress to the several states to aid them in constructing public highways in the several states. This act of Congress is known as the State Aid Act for the construction of post roads. This act has been accepted by the state, and it has acted under it, as appears from the act of the Legislature creating the highway department and the commission. Section 20 of this act (Gen. Acts 1919, p. 897) is an express adoption and ratification of the act of Congress, and by which it pledges the faith of the state to accept and carry out the proposal made by Congress to the states in this State Aid Act.

The state has thus accepted the offer of the federal government, and has in effect proclaimed that it has so amended its Constitution as to authorize it to issue and sell bonds and to levy privilege or license taxes for the exclusive use of the state for highway purposes, which it could not theretofore do. The state has not only proclaimed the amendment to be adopted, but the people and the state have accepted and functioned under it by issuing and selling bonds, by levying and collecting taxes for the exclusive purpose of the state highways, and has so expended the funds. It has therefore been clearly accepted and ratified, and the state government functioned and operated under the assumption that it was a part of the organic law, and I am of the opinion the principle recognized in these authorities applies with force here, and that the time has now come when this court should not—

"inquire too technically into any mere irregularities in the manner of proposing and submitting to the people that which they have solemnly adopted and subsequently recognized and acted upon as part of the fundamental law of the state."

The discussion of this principle, and its recognition, is also important in view of another amendment of the Constitution, known as the soldiers' poll tax amendment, adopted by the people of the state, but which appears to be subject to the same criticism as that which the majority treat as fatal to the amendment here under consideration. If the poll tax amendment is likewise held subject to this infirmity, then the question arises as to whether or not the foregoing principle should be brought into view, and the amendment saved by its application. By this amendment thousands who served in the army and navy during the period of the World War, and who were honorably discharged from such service, and qualified electors, except for the payment of poll tax, were exempted from its payment, and this amendment was proclaimed as a part of the organic law, and the Legislature of this state subsequently ratified and adopted and put it into operation, and the people of the state have accepted and acted upon it as a part of the Constitution, and these men exercise the right of franchise in reliance thereon. This amendment was brought before this court in Cornelius v. Pruet, 85 South. 430;[1] but the question as to its constitutionality was not presented, and therefore not considered. However, we cannot shut our eyes to the fact that evidently the decision in that case was accepted and acted upon by those interested, as well as by other departments of the state, as having met with the approval of the court. That amendment, therefore, in my opinion, has been fully accepted and ratified, and the state government has functioned under the assumption that it was part of the organic law, and should be protected by the foregoing principle.

I forego further discussion, and respectfully dissent from the majority view.

SOMERVILLE and THOMAS, JJ., concur.

[1] 204 Ala. 189.